NATURAL ASSOCIATION OF SOCIAL WORKERS, et al., Plaintiffs,

v.

John B. HARWOOD, et al., Defendants.

Civ. A. No. 93–0229 P.

United States District Court, D. Rhode Island.

Jan. 10, 1995.

---

Amy Tabor, Pawtucket, RI, for plaintiffs.

Richard Gonnella, Providence, RI, for defendants.

### MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

■ This case questions the constitutionality of a rule of the Rhode Island House of Representatives which plaintiffs claim is interpreted and enforced so as to allow governmental lobbyists onto the floor of the House while the House is in session while denying lobbyists for private organizations the same access. Plaintiffs claim that this rule, Rule 45, violates their First and Fourteenth Amendment rights.

This issue was first presented to the Court in dual motions for summary judgment, which were both denied. After a trial on the merits, I issued a memorandum and order on August 25, 1994. *National Assoc. of Social Workers v. Harwood,* 860 F.Supp. 943 (D.R.I. 1994). The defendants subsequently filed a motion to alter the judgment, contending that this Court misapplied the limited public forum doctrine set forth in *Perry Educ. Ass'n v. Perry Local Educator's Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) and in *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Subsequent to the publication of my original opinion, the First Circuit issued *AIDS Action Comm. v.*

*Massachusetts Bay Transp. Auth.,* 42 F.3d 1 (1st Cir.1994). In recognizing the "murky status" of the public forum doctrine, the court emphasized that the government's intent to create a public forum is critical to the determination that a limited public forum has been established. *AIDS Action Comm.,* 42 F.3d at 8. In light of defendants' motion and the intervening First Circuit opinion, I now modify the original memorandum and order with this opinion.

### I. Factual Background:

The case initially came before this court on motions for Summary Judgment filed by both plaintiffs and defendants. In my opinion of November 9, 1993 denying both motions, I discussed the facts of the case at length, and I reproduce that discussion verbatim below:

Involved in this controversy is the interplay between Rhode Island House of Representatives Rule 45 and Rhode Island General Laws 22–10–2(a), 22–10–5, and 22–10–8. The plaintiffs contend that the foregoing rule and general laws are being interpreted by the defendants in an impermissibly unconstitutional manner violative of the First Amendment (freedom of speech) and the Fourteenth Amendment (Equal Protection).

The factual setting giving rise to this litigation is simple. The defendants, John Harwood, Speaker of the House, and Guido Petteruti, Head Doorkeeper, are excluding from the House floor, while it is in session, all lobbyists who must comply with the registration and badge wearing requirements of R.I. Gen. Laws 22–10–5 and 22–10–8. At the same time, they are permitting certain persons, exempted by 22–10–3 and 22–10–4.1 to remain even though some of said exempted individuals may be lobbyists.

In February of 1993, the Rhode Island House of Representatives adopted new rules. These include Rule 45, which excludes lobbyists from the floor and the lounge of the House of Representatives

when the House is in session.[1] The plaintiffs in this case include non-profit organizations,[2] individuals who are registered lobbyists for these organizations, and elected members of the Rhode Island House of Representatives. They challenge this Rule as it is interpreted and enforced by the defendants, John Harwood and Guido Petteruti, respectively the Speaker of the House and the Head Doorkeeper of the House.

The parties disagree as to what sorts of activity and behavior by members of the public were allowed by House Rules and practice prior to the 1993 adoption of Rule 45. According to the plaintiffs, "for many years prior to 1993, private lobbyists and government employees were on the floor of the House on a regular basis, providing information and seeking to influence legislation." (Mem.P. & A.Supp.Pls.' Mot. Summ.J. at 5.) The floor of the House was open to the public, including lobbyists, on a first-come, first-serve basis while the House was in session. (*Id.* at 4.) The plaintiffs maintain that both private and governmental lobbyists were quiet and maintained decorum during House sessions, and that, to their knowledge, no private or governmental lobbyist was ever removed from the House floor by the Speaker of the House, the House Doorkeeper, or the Assistant Doorkeepers for being noisy and disruptive. (*Id.* at 6–7.) The lobbyists and legislators would communicate with each other in the following ways: in whispered conversations initiated by legislators and occurring in the back or side of the Chamber, outside the closed door of the Chamber, or in the House Lounge; via written notes conveyed by House pages; or with written drafts of proposed floor amendments given from legislators to lobbyists. (*Id.* at 8–9.)

Defendants make several responses to plaintiffs' assertions that historically lobbyists were allowed on the House floor while the House was in session in order to provide information to legislators and to attempt to influence legislation. First, defendants claim that "to the extent that any of these activities were being conducted while the House was in session, they were in clear contravention of the then existing rules relative to decorum and debate." [3]

1. The full text of Rule 45 provides as follows:
SIXTHLY—OF ADMISSION TO THE FLOOR
45(a) The following persons shall be entitled to admission to the floor of the House during the session thereof: The Governor, the Lieutenant Governor, the Secretary of State, the Attorney General, the General Treasurer, the state controller, and members of the Senate, judges and ex-judges of the United States court and of the state courts, ex-Speakers of the House, ex-members of the General Assembly, representatives of the legislative council, legislative staff, director of the department of administration, the budget officer, assistant in charge of law revision, and clerks of the Senate and House committees, superintendent of public buildings, state librarian, and the authorized representatives of the press, as provided in the rule next following, and such other persons as shall be admitted to the floor by the Speaker. *At the discretion of the Speaker, members of the public may be admitted to the House floor, provided, however, that all such persons may not stay in the House chamber unless they remain seated along the sides of the chamber, refrain from conversation, and maintain the decorum of the House.* All persons who are unable to access the House galleries by reason of physical handicap shall be entitled to admission to the House floor.
(b) *Lobbyists including former state legislators who are lobbyists shall not be entitled to admission to the floor of the House during the session*

thereof. *No person entitled to admission to the floor of the House during the session thereof, shall either directly or indirectly engage in the practice of lobbying as defined in Rhode Island General Laws (22–10–2).*
(c) Admission to the House lounge is limited to House members and persons invited and accompanied by a House member who will be responsible for them while in the lounge. Such persons when no longer accompanied by the House member with whom they entered, shall leave the lounge. *No lobbyists shall be admitted to the House lounge during the House session.* (Emphasis added.)

2. These organizations include the National Association of Social Workers; the National Education Association; Ocean State Action; the Rhode Island Affiliate, American Civil Liberties Union; the Rhode Island State Rifle and Revolver Association; the Rhode Island State Right to Life Committee, Inc.; and the Coalition to Preserve Choice. Mem.P. & A. Supp.Pls.' Mot. Summ.J. at 2.

3. Defendants refer specifically to House Rule 15, which states that "[w]hile the Speaker is putting any question, or addressing the House, or when a member is speaking, none shall entertain private discourse, nor walk between the member who is addressing the Speaker and the Chair."

(Defs.' Mem.Law Opp'n.Pls.' Mot. Summ.J.Supp.Own Mot.Summ.J. at 2.) Also, defendants dispute plaintiffs' claim that such activities were occurring while the House was in session. "Nowhere in any of the depositions or affidavits taken in this matter is there any information remotely constituting evidence that the House of Representatives, *while in session*, has been some sort of a forum for the expression and communication of ideas by persons who are not elected members of that body." (*Id.* at 4, emphasis added.) Finally, defendants say that if such lobbying did take place on the floor of the House while the House was in session prior to 1993, it occurred without the knowledge and acquiescence of the former Speakers of the House. (*Id.* at 4.)

Despite these disagreements between plaintiffs and defendants as to what sorts of activities lobbyists properly engaged in under the pre–1993 House rules, neither plaintiffs nor defendants dispute the fact that all lobbyists, whether representing private or governmental organizations, could be *present* on the floor of the House prior to the adoption of Rule 45. Thus, before 1993, all lobbyists had the same opportunity to be present on the floor of the House and to gather information regarding last minute changes in the agenda and floor amendments.[4]

On its surface, Rule 45 appears to ban the presence of all lobbyists and the practice of lobbying from the floor of the House and the House lounge. Rule 45(b) explicitly incorporates the definition of "lobbying" provided by Rhode Island General Laws § 22–10–2, a definition which does not distinguish between private and governmental lobbyists.[5] Indeed, R.I.Gen.Laws § 22–10–2(b) defines "lobbyist" as "any person who engages in lobbying as the appointed representative of another person" and does not make reference to the identity of the lobbyist's employer. Defendants maintain that this view of Rule 45 is the correct one, and that "Rule 45 ... is just a logical extension of the rule respecting decorum and debate, and simply circumscribes the activities of registered lobbyists while the House is in session." (Defs.' Mem.Law Opp'n.Pls.' Mot.Summ.J.Supp.Own Mot. Summ.J. at 3.)

However, plaintiffs contend that although the language of Rule 45 may appear to bar all lobbyists in an even-handed way, the defendants are applying Rule 45 in a fashion that has non-neutral consequences. Plaintiffs argue that Rule 45 is being interpreted by defendants in conjunction with the definitions and exemptions of R.I.Gen. Laws § 22–10 in a way that bars only private lobbyists from the House floor and lounge, but allows lobbyists for governmental organizations to remain.[6] As a re-

---

**4.** Plaintiffs offer the following undisputed discussion of the floor amendment process in the Rhode Island House of Representatives.

"In the Rhode Island House of Representatives, amendments to bills are often introduced for the first time from the floor of the House while it is in session. This is most common during the later weeks of the session, when House committees are no longer meeting, and all formal action on legislation takes place on the House floor. In the last weeks of the House session, the House may consider forty or more bills a day, with proposed amendments often being introduced for the first time on the floor of the House. Such proposed amendments are frequently not available to the public, lobbyists, or even legislators other than the amendment's sponsor until the moment they are introduced on the House floor. Even after their introduction on the floor, they are available to the public, including lobbyists, only if a legislator who is on the House floor gives a copy of the proposed amendment to the lobbyist or other person. It is also a frequent occurrence, especially in the

weeks near the end of the legislative session, that the House vote to pass or defeat such a floor amendment occurs on the same day as, and sometimes within minutes of, the amendment being introduced."

**5.** R.I.Gen.Laws 22–10–2(a) defines "lobbying" as "acting directly or soliciting others to act for the purpose of promoting, opposing, amending, or influencing in any manner the passage by the general assembly of any legislation or the action on that legislation by the governor."

**6.** The following statutory provisions are crucial to plaintiff's argument:

**22–10–5. Register—Information shown—Public records.**—The secretary of state shall prepare and keep in conformity with the provisions of this chapter two (2) separate registers for lobbyists. One shall be for persons lobbying in legislative matters, and one for lobbyists who qualify under § 22–10–4. In these registers shall be entered the name and business address of the

sult, the plaintiffs claim that they are being prevented from receiving crucial information on political activities, information to which governmental lobbyists still have access. Specifically, plaintiffs maintain that under the provisions of R.I.Gen.Laws § 22–10, "only lobbyists for private organizations [ ] are required to wear badges which identify them as lobbyists, and which identify the organizations they represent" (Mem.P. & A. Supp.Pls.' Mot. Summ.J. at 13), and that, pursuant to their enforcement of Rule 45, defendants are barring only those people who are wearing lobbyist badges, but not those governmental lobbyists that are exempt from wearing a badge under R.I.Gen.Laws § 22–10–4.1.[7]

*National Association of Social Workers v. Harwood,* No. 93–0229, 1993 WL 742703 at *1–2 (D.R.I. Nov. 10, 1993). The motions for summary judgment being denied, the case was tried from July 5 through 8, 1994.

## II. Discussion:

Based on the evidence and testimony presented at trial, this Court has made a series of factual determinations. To begin with, the Court finds that prior to Rule 45's adoption, representatives of both private and governmental organizations were allowed to be present on the floor of the House. They were allowed to be seated along the outside aisles (in what the Court has termed "the permitted area") and were allowed to communicate with legislators via whispered conversations on the sides or in the back of the chamber, via written notes passed by pages or other legislators, or via physical gestures and signals. They also discussed matters with legislators in the House Lounge. They were able to communicate with legislators during debates on floor amendments. Tr., 7/5/94 at 38–39, 42–46, 168–171. However, the Court finds that subsequent to Rule 45's adoption, lobbyists for private organizations, who are required to wear badges, have been regularly excluded from the floor of the House. In contrast, some agents or employees of governmental bodies are allowed to be present on the floor of the House while it is in session, as are members of the general public.

### 1) Governmental Lobbying

Resolution of this case turns on the activities of governmental agents or employees who were granted access to the floor of the House of Representatives while the House was in session. Plaintiffs claim that these governmental agents were engaged in lobby-

employer, and the name, residence, and occupation of the persons employed for any lobbying purpose in connection with legislation, the date of the employment or agreement therefor (sic), the length of time the employment is to continue, if such time can be determined, and the legislation by bill number or by the subject matter . . .

**22–10–8. Identification badge.**—(a) There shall be issued by the secretary of state to every person who shall qualify as a legislative lobbyist, as provided in this chapter, an identification badge evidencing qualification in such form as shall be prescribed by the secretary of state. Every lobbyist shall conspicuously display this identification badge on his or her clothing while in the state house at all times of the day during any legislative session, and at all times of the day during any committee meeting or joint committee meeting of the general assembly. The color of the identification badge shall be changed each legislative year. The badge shall include but not be limited to the word "Lobbyist" in bold print as well as the name of the lobbyist, the year, the registration number of the lobbyist, and the name of the employer.

**22–10–3. Exemptions.**—The following persons shall be exempt from the provisions of this chapter:

(1) Any elected public official or the official's designee acting in his or her official capacity. . . .

**22–10–4.1. Governmental employees.**—Any employee of any branch of federal, state, or local government acting in his or her official capacity shall register his or her name and the agency which he or she represents in a separate register which shall be maintained by the secretary of state for that purpose. Each such governmental employee shall register his or her name annually commencing with the year he or she begins lobbying activity. Such employees shall be exempt from the remaining provisions of this chapter. For the purposes of this exemption, agents and employees of public corporations shall not be considered state or local employees.

**7.** At Paragraph 14 of the Answer of John B. Harwood and Guido Petteruti, "Defendants admit that registered lobbyists, *who can be identified by the badge they are required to wear pursuant to statute,* are barred from the floor of the House when it is in session, and all lobbying activities are barred and forbidden on the House floor when the House is in session." (Emphasis added.)

ing, a type of political speech which is at the core of the First Amendment, whereas defendants contend that they were simply present to provide neutral information to legislators. For example, when asked by the Court if he was familiar with any individuals who are government lobbyists, Mr. Edward Clement, the Legislative Coordinator for the House of Representatives, responded, "I have never considered them lobbyists, your Honor. I considered them people called there by the members of the House for informational purposes." Tr., 7/7/94 at 158. Similarly, when asked about Mr. Michael O'Keefe, a registered lobbyist for the state Budget Office who is frequently at the State House, Speaker Harwood gave the following explanation:

Michael O'Keefe, I can't answer the question the way you're asking it because Michael O'Keefe is the Budget Office. Michael O'Keefe from my way of understanding is like Jim Mahoney [a member of the House staff involved in budget matters]. He is a dollar-and-cents guy. He is the guy who balances budgets. He is a resource factual guy. He's not a guy, in my opinion, like Jim Mahoney, who lobbies. Here's a guy who says, here's the revenue, here's expenses; this is reality; this is how we got to balance the budget. When you say influence, I don't look at him as a lobbying, influence guy. He's the guy who is literally the guy in charge of balancing the budget like Jim Mahoney is.

Tr., 7/8/94 at 52–53.

A determination of whether or not the House of Representatives was in fact allowing governmental agents to engage in the first amendment activity of lobbying is essential to the final outcome of the case.[8] In order to make this determination, this Court must formulate a precise definition of a "governmental lobbyist" or "governmental lobbying." This Court considers anyone registered in the register set up for governmental lobbyists by R.I.Gen.Laws § 22–10–4.1 ("Any employee of any branch of federal, state, or local government acting in his or her official capacity shall register his or her name and the agency which he or she represents in a separate register which shall be maintained by the secretary of state ...") to be a governmental lobbyist. Furthermore, any individual who is employed by a government or who is acting as an agent of a government and who is engaging in activities defined as "lobbying" under R.I.Gen.Laws 22–10–2(a) ("acting directly, or soliciting others to act for the purpose of promoting, opposing, amending, or influencing in any manner the passage by the general assembly of any legislation or the action on that legislation by the governor") is a governmental lobbyist. An individual who engages in such activities is a lobbyist regardless of whether the individual's name appears on the register set up by R.I.Gen.Law § 22–10–4.1. This definition of lobbying includes the presentation by governmental agents to legislators of statistical and numerical information pertinent to pending legislation, particularly when the governmental body to whom that agent is responsible has taken a position on the pending legislation. This Court feels a particular duty to point out that the Rhode Island definition of

---

8. This Court discussed the status of lobbying under the First Amendment in the Memorandum and Order denying the Motions for Summary Judgment:

[L]obbying—"the right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws"—is "core" political speech, prototypical of the kind of speech protected by the First Amendment. *Eastern Railroad Presidents Conference, et al. v. Noerr Motor Freight, Inc., et al.*, 365 U.S. 127, 139 [81 S.Ct. 523, 530, 5 L.Ed.2d 464] (1961). This First Amendment protection extends both to volunteer and to paid lobbyists. It is not just an abstract or generalized notion of lobbying that is protected by the First Amendment; rather, incorporated within the First Amendment protection of lob-

bying are the practical concerns of effectiveness and economic constraints. Thus, for example, a state's "prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 [108 S.Ct. 1886, 1893, 100 L.Ed.2d 425] (1988) (citations omitted).

*Id.* at 11.

lobbying, which specifically refers to efforts to influence legislation *in any manner*, includes in its prohibition the provision of facially neutral statistical information by a representative of an interested governmental unit. The Court's need to state this explicitly stems from testimony by both Mr. Clement and Speaker Harwood that they do not perceive such actions as lobbying. One need not present oneself as an "influence, lobbying guy" (Tr. 7/8/94 at 52–53) in order to be carrying out lobbying activities; indeed, lobbyists who engage in more subtle forms of presentation may find their persuasive abilities enhanced.

Given this definition of governmental lobbying, the Court's next task is to determine whether governmental lobbying has in fact been permitted on the floor of the Rhode Island House of Representatives while the House is in session. Based on the evidence presented at trial, this Court concludes that defendants permitted agents of governmental organizations to be present, to speak, to respond to questions, to provide information, and to confer with legislators on the House floor during House sessions on frequent occasions. The Court finds that these governmental agents or employees have been allowed to engage in activities that fall under the definition of lobbying contained in R.I.Gen.Laws 22–10–2(a). These governmental lobbyists include representatives from the state Fire Marshal's office (Tr., 7/7/94 at 68–70), the Department of Econom-

ic Development (Tr., 7/7/94 at 70–72), the Banking Division and the Insurance Division of the Department of Insurance Regulation (Tr., 7/7/94 at 72–75), the Department of Human Services (Tr., 7/5/94 at 189–192), and the office of the Mayor of Providence (Tr., 7/6/94 at 80–85).[9]

## 2) The Legal Standard

Faced with the task of analyzing when the First Amendment gives a citizen the right to engage in expressive activity on public property, the Supreme Court has developed three categories of public property—the public forum, the limited public forum, and the non-public forum. The Court has stated that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The significance of the public forum doctrine has been eloquently stated:

> Access to government property can be crucially important to those who wish to exercise their First Amendment rights. Government property often provides the only space suitable for large gatherings, and it often attracts audiences that are otherwise difficult to reach. Access to government property permits the use of the less costly means of communication so "essential to the poorly financed causes of

9. The extent to which such lobbying was flagrantly permitted is demonstrated by the testimony of Edith Ajello, describing the activities of Ann Quinterno, a lobbyist representing the Mayor of Providence. Representative Ajello testified that Ms. Quinterno was on the floor of the House every day during the 1994 legislative session, and described an episode when she saw Ms. Quinterno on the floor of the House with a telephone:

A. I did see her with a telephone.
Q. What, if anything, did you observe her doing with that telephone?
A. I observed her appearing to be listening to a conversation on the phone. I observed her hand that telephone to other members of the House.
Q. When you say members of the House, you mean legislators?
A. Yes.
Q. Did you observe what those legislators did when they took the phone from her?

A. They appeared to listen and to speak.
Q. Was this a cordless telephone?
A. Yes.
Q. Did you observe her hand the phone to anyone other than the rank and file legislators on the floor of the House?
A. I observed the phone being passed via someone else to the Speaker, Mr. Harwood.
Q. What, if anything, did you observe Mr. Harwood do when he received the telephone?
A. He listened, appeared to listen, spoke, and my memory is that there was a smile and a chuckle, also.
THE COURT: Apparently, she must have been in the area I termed the prohibited area while this is going on?
THE WITNESS: That's true.
THE COURT: Okay. Does she wear a badge?
THE WITNESS: No, she doesn't, Your Honor.
Tr., 7/6/94 at 84–86.

little people," and "allow[s] challenge to governmental action at its locus."

In addition to furthering the First Amendment rights of individuals, the use of government property for expressive activity helps further the interests that freedom of speech serves for society as a whole: it allows the "uninhibited, robust, and wide-open" debate about matters of public importance that secures an informed citizenry, it permits "the continued building of our politics and culture," it facilitates political and societal changes through peaceful and lawful means, and it helps to ensure that government is "responsive to the will of the people."

*Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 815–16, 105 S.Ct. 3439, 3456, 87 L.Ed.2d 567 (1985) (Blackmun, J., dissenting) (citations omitted).

 The first of the three categories of government property is the public forum. The public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate, [and in which] the rights of the State to limit expressive activity are sharply circumscribed." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. The street corner or the public park are quintessential examples of the public forum; these are spaces which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Any content based restriction that the State wishes to place upon expressive activity in a public forum must be narrowly drawn to serve a compelling state interest. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56. Any effort by the State to regulate the time, place, and manner of expression must be content-neutral, must be narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.

 The second category of government property, which the Supreme Court has labeled the "limited public forum" or the "public forum created by government designation," is property which the government has opened as a forum for expressive activity for a limited amount of time, *Heffron v. Int'l Soc'y for Krishna Consciousness,* 452 U.S. 640, 655, 101 S.Ct. 2559, 2567–68, 69 L.Ed.2d 298 (1981), for a limited class of speakers, *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), or for a limited number of topics, *Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 175, n. 8, 97 S.Ct. 421, 426, n. 8, 50 L.Ed.2d 376 (1976). When discussing the public forum created by government designation, the Supreme Court has explained that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (citations omitted).

 A State may not be required to create or open a forum to expressive conduct in the first place, but if it does so, it is constitutionally forbidden from enforcing certain exclusions from the forum. A State need not retain the open character of the forum indefinitely. *See Perry,* 460 U.S. at 45–46, and n. 7, 103 S.Ct. at 954–56, and n. 7. However, as long as it does acquiesce in the use of the property as a forum for expressive activity, any regulations of the time, place, and manner of expressive activity must be "justified without reference to the content of the regulated speech," must be "narrowly tailored to serve a significant governmental interest," and must "leave open ample alternative channels for communication." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *Heffron,* 452 U.S. at 647–648, 101 S.Ct. 2559, 2563–64. Regulations other than those governing the time, place, and manner of expressive conduct must be narrowly drawn to effectuate a compelling state interest. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56.

■ The third category of government property, the nonpublic forum, consists of government property which has not been designated as a forum for general expressive activity either by tradition or by explicit government action, and which is not compatible with such activity. The Court has recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government," *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981), and has explained that "[i]n cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum," *Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450. Just as with the traditional public forum and the limited public forum, distinctions between speakers allowed access and those denied access to the nonpublic forum must be viewpoint neutral. Furthermore, the regulations must be reasonable in light of the purpose served by the forum. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56.

■ In order to know the legal standard by which to evaluate the interpretation, application, and enforcement of Rule 45, and in order to determine whether plaintiffs' rights have been violated, this Court must determine whether the floor of the Rhode Island House of Representatives while the House is in session is a public forum, a limited public forum, or a nonpublic forum. The floor of a state legislature, although certainly a place "devoted to assembly and debate" among the legislative representatives, is not a traditional public forum; it is not a place "immemorially [ ] held in trust for the use of the public," *Hague v. CIO,* 307 U.S. at 515, 59 S.Ct. at 964, nor is it a traditional location for citizens to gather, air their views, and debate questions of public moment.

The task of determining whether the floor of the House during House sessions is a limited public forum or a nonpublic forum, however, is a more difficult one. After all, "[t]he line between limited public forums and nonpublic forums 'may blur at the edges,' and is really more in the nature of a continuum than a definite demarcation." *Cornelius,* 473 U.S. at 819, 105 S.Ct. at 3458 (Blackmun, J., dissenting) (citations omitted).

The grounds and buildings of state and federal capitol complexes and governmental bodies have consistently been held to be public fora or limited public fora. *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalk of U.S. Supreme Court); *Duffy v. Quattrocchi,* 576 F.Supp. 336 (D.R.I.1983) (auditorium where legislature held a one-day public hearing); *Reilly v. Noel,* 384 F.Supp. 741, 744 (D.R.I. 1974) (state house rotunda); *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972) (grounds of the United States Capitol). The case most factually analogous to the case at bar that this Court has found is *Act–Up v. Walp,* 755 F.Supp. 1281 (M.D.Pa.1991). In *Act–Up v. Walp,* the gallery of the chamber of the Pennsylvania House of Representatives, which was usually open to all members of the public who wished to enter, was closed during the Governor's State of the Commonwealth address. During trial, the government admitted that the purpose behind the closing of the gallery was to deny members of the Philadelphia chapter of ACT–UP access during the speech. The gallery was both a place physically removed from the floor of the House and a place in which visitors were silent and had no interaction with legislators. Despite these limits on the communicative activities allowed to members of the public present in the gallery, the trial court nevertheless ruled that the gallery to the Pennsylvania House of Representatives was a limited public forum. In doing so, the court compared the case to *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), in which the Supreme Court found that a municipal theater was a public forum, and that a city was not allowed to ban a controversial stage production from being performed in that theater based on vague allegations of obscenity.

Simply because the House gallery is a place in which visitors are not invited to speak does not mean that there is not communicative activity present which

would make the gallery a limited public forum. Indeed, compared with the theater in *Southeastern Promotions,* the gallery of the House chamber is even more a place where communication and expression have traditionally been carried on. Importantly, the communication in the theater is generally only one directional—the players to the audience. In contrast, the communication in the (sic) between the chamber and gallery works two ways: the audience listens to the political decisionmaking of the elected officials, and the elected officials receive the message, by the very presence of citizens in the gallery, that they are being watched, that their decisions are being scrutinized, and that they may not act with impunity outside the watchful eyes of their constituents. In fact, the closing of the gallery of the house chamber, the very seat of political power in the Commonwealth, is surely of more moment in the first amendment context than restriction on the availability of a theater for the portrayal of entertainment or satire, even if political in nature.

*Act–Up v. Walp,* 755 F.Supp. at 1288.

■ In the instant case, the floor of the Rhode Island House of Representatives was open as a forum for expressive activity by the general public, and by both public and private lobbyists prior to the adoption of Rule 45. After the passage of Rule 45, it is the factual finding of this Court that the floor of the House is still made available as a forum for expressive activity to the general public, and to the limited class of governmental lobbyists. The general public and governmental lobbyists are allowed to be physically present, thus at least engaging in the communicative and expressive activity that sheer physical presence entails and that was described by the court in *Act–Up v. Walp.* As the court in *Act–Up v. Walp* explained, physical presence is a fully valid and eloquent form of expressive or communicative activity. It is in no way legally limited or subordinate to other forms of expression or communication, such as oral communication. If communication through physical presence is allowed in a nontraditional forum, it is a form of expression fully adequate to qualify as public discourse and thus to create a

limited public forum. The Rhode Island House of Representatives clearly intended to admit the general public to the House floor. Therefore, the floor of the House, while in session, is a limited public forum.

In a recent opinion, the First Circuit, in dicta suggested that in the application of the public forum doctrine,

> courts should hinge their analyses largely on whether the government *intended* that the property become a designated public forum (citations omitted) ... [T]he Court also has stated that the government's intent must be gleaned from its policy and practice with respect to the property at issue (citations omitted).

*AIDS Action Comm. of Massachusetts v. Massachusetts Bay Transp. Auth.,* 42 F.3d 1, 8 (1st Cir.1994). Here, both policy and practice demonstrate that the House intended to open the floor to the public. Rule 45(a) states that:

> [a]t the discretion of the Speaker, members of the public may be admitted to the House floor, provided, however, that all such persons may not stay in the House chamber unless they remain seated along the sides of the chamber, refrain from conversation, and maintain the decorum of the House.

The record likewise reflects that the practice of the Speaker has been to admit members of the general public. Thus, I find that the requisite "intent" to create a limited public forum has been satisfied.

3) Analysis

By excluding "lobbyists" from admittance to the House, Rule 45 restricts access to a limited public forum. Rule 45, with respect to the exclusion of all lobbyists, is a regulation by the government of the time, place, and manner of the expressive activity of citizens. Having found that the floor of the House during House sessions is a limited public forum, this Court must now evaluate Rule 45 according to the correct legal standard. Rule 45 must meet three requirements: it must be "justified without reference to the content of the regulated speech," it must be "narrowly tailored to serve a

significant governmental interest," and it must "leave open ample alternative channels for communication." *See supra* at 538.

The third of these requirements, that a time, place, and manner restriction in a limited public forum leave open ample alternative channels for communication, is not met in this case. Testimony in this case, both by lobbyists and by legislators, indicates overwhelmingly that adequate means of communication between lobbyists and legislators are difficult to find. Unlike representatives to the United States Congress, representatives elected to the Rhode Island House of Representatives are part time legislators. They lack legislative office quarters in the State House or elsewhere, they lack legislative staffs, and they generally have full time jobs in addition to their legislative duties. Thus, lobbyists cannot communicate to them through staff members or by visiting them in a legislative office building. To attempt to communicate with them at their places of employment is to infringe upon them while they are fulfilling other duties. Testimony indicates that legislators are frequently away from home, and are difficult to reach in their homes. Communications through the mail tends to be ineffective both because writings, by their nature, cannot respond to specific concerns and questions of legislators, and because legislators are inundated with mail. Finally, plaintiffs provided persuasive testimony that with regard to floor amendments, which are often proposed and voted on in the same House proceeding, the only timely and useful communication that can take place is that which occurs on the floor of the House, during the debate on the amendment. In sum, the evidence in this case indicates that the application of Rule 45 so as to admit members of the public, but not "lobbyists" to the floor of the House fails to leave open ample alternative means of communication for the lobbyists.

Having found that Rule 45 does not leave open to plaintiffs ample alternative means of communication, this Court finds the rule to be an improper regulation of the time, place, and manner of expressive activity. I therefore need not address the other two requirements of a time, place, and manner regulation in a limited public forum, namely, whether the rule is content neutral and whether it is narrowly tailored to serve a significant government interest.

■ In addition to the exclusion of all "lobbyists" pursuant to Rule 45, plaintiffs allege that the *application* of the Rule by the defendants serves to allow lobbying by governmental lobbyists, while excluding lobbying by private lobbyists. *See National Association of Social Workers v. Harwood*, No. 93–0229, 1993 WL 742703 at *2 (D.R.I. Nov. 10, 1993). In doing so, plaintiffs argue, the defendants are discriminatorily banning certain speakers, those who express the viewpoints of private organizations, while admitting others, those who express the viewpoints of government agencies. I find plaintiffs' argument persuasive. As in *Act–Up v. Walp*, where the House closed the gallery to the public in order to exclude members of a specific group, the attempt to exclude private lobbying by banning all lobbying, is a content-based restriction, and thus "any time, place, and manner limits used to carry out the restriction are invalid." *Act–Up v. Walp*, 755 F.Supp. at 1289. I conclude that the application of Rule 45 amounts to a content based restriction on speech.[10]

In order for the government to constitutionally enforce a content based restriction, it must be "narrowly drawn to effectuate a compelling government interest." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. From the record in this case I conclude that there is no justification for exclusion of private lobbying alone that meets this standard. To the extent that defendants claim that Rule 45 (and its application) furthers an interest in preventing disruptive behavior, I find this position less than compelling. While a state

---

**10.** An additional policy consideration informs my judgment. Under these facts, content discrimination can give rise to an appearance of viewpoint discrimination. As in *AIDS Action Comm.*:

[t]hese circumstances also lend themselves at least to an appearance of viewpoint discrimi-

nation. Regardless of actual motivation, grave damage is done if the government, in regulating access to public property, even appears to be discriminating in an unconstitutional fashion.

42 F.3d at 11.

undoubtedly has a strong interest in preserving decorum during its legislative proceedings, there is no evidence that private lobbying is more disruptive than government lobbying, particularly in light of my finding that both engage in similar lobbying activities.

The plaintiffs raise two other issues in this case. They argue that Rule 45, as interpreted and enforced by defendants, violates the Fourteenth Amendment Equal Protection rights of the plaintiff-lobbyists, as well as the First Amendment rights of the plaintiff-legislators to receive information from lobbyists. Having found that Rule 45 places an impermissible time, place, and manner restriction on plaintiff's expressive activity, this Court does not need to decide the Equal Protection claim. Even if I should find an Equal Protection violation, the remedy for such a violation would be the same as the remedy for an improper time, place, and manner regulation. *See infra*, at 542–543.

■ The claimed right of the plaintiff-legislators to receive political information, however, must be specifically addressed. Plaintiff-legislators assert that, because private lobbyists are excluded from the House floor, the legislators' First Amendment right to receive political information in a meaningful time, place, and manner is being infringed upon. At first glance, this position appears meritorious; having found that no adequate alternative means exist for private lobbyists to engage in expressive activity, it seems consistent for this Court to make a parallel finding with regard to the legislators' reception of the information. However, I find that the legislators are situated differently from the private lobbyists, and I hold that their First Amendment rights to receive information are not being violated.

To begin with, legislators can be much more proactive than lobbyists. Legislators have the opportunity to pursue information that they desire on topics that interest them; they can research issues relevant to pending legislation and can contact lobbyists with their questions. In contrast, lobbyists cannot compel the attention of legislators. It is difficult for private lobbyists even to inform legislators that they may be lacking relevant information or to bring new concerns to the

legislators' attention, particularly in situations where governmental lobbyists and private lobbyists have differential access to the representatives. Furthermore, this Court does not believe that if legislators are denied two-minute long, whispered conversations with lobbyists in the aisles of the chamber, that this denial rises to the level of a constitutional deprivation. It strains credulity to accept that our elected representatives are so reliant upon last-minute hurried communications from lobbyists that to end these communications would amount to a violation of their First Amendment rights.

### 4) Remedy

■ In their prayer for relief, plaintiffs ask this Court to restrain defendants from

(a) denying plaintiffs, lobbyists for plaintiffs, and other lobbyists access to the floor of the Rhode Island House of Representatives and the House Lounge when the House is in session, with such access to be provided on a first-come, first-serve basis as was the case prior to the 1993 session of the Rhode Island General Assembly; (b) commencing any contempt or other proceeding against Plaintiffs or any representative of plaintiffs for entering the House Lounge or the floor of the Rhode Island House of Representatives while the House of Representatives is in session.

Verified Complaint for Declaratory and Injunctive Relief at 18. Despite my finding that Rule 45, as interpreted and enforced by defendants, is an unconstitutional time, place, and manner restriction on expressive activity in a limited public forum and an unconstitutional content based restriction, I cannot comply with plaintiffs' request that I require defendants to return to the pre–1993 practice of admitting all lobbyists, public and private, onto the floor of the House on a first-come, first-serve basis. Defendants properly point out that "neither this United States Court nor any Rhode Island Court—nor any entity other than the elected members of the Rhode Island House of Representatives—may make rules for that body." Post–Trial Memorandum of Defendants at 14.

This Court does have the authority, which it now exercises, to declare the current interpretation and enforcement of Rule 45 unconstitutional, and to order the Rhode Island House of Representatives to desist from continuing its current practices with regard to this issue. The hallowed doctrine of separation of powers, however, which is foundational to our legal system, teaches that the fashioning of a remedy in this case lies not with the federal judiciary but rather with the Rhode Island House of Representatives. It is not within the power and authority of this Court to impose any given set of procedures upon a democratically elected legislative body. The role of the Court is limited to that of evaluating any practice or procedure of the House and assuring its constitutionality.

Judgment for plaintiffs, costs and attorneys' fees.[11]

SO ORDERED.

---

11. For entitlement to attorneys' fees, see separate memorandum and order issued concurrently with this opinion.