UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1090

NATIONAL ASSOCIATION OF SOCIAL WORKERS, ET AL.,

Plaintiffs, Appellees,

v.

JOHN B. HARWOOD, ET AL.,

Defendants, Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge] 



Before

Selya, Cyr and Lynch,

Circuit Judges. 



John A. MacFadyen for appellants. 
Jeffrey B. Pine, Attorney General, and Alan M. Shoer, 
Special Assistant Attorney General, on brief for State of Rhode
Island, amicus curiae.
Amy R. Tabor, with whom Hardy Wood Tabor & Chudacoff was on 
brief, for appellees.



November 13, 1995



SELYA, Circuit Judge. Over a century ago, Charles SELYA, Circuit Judge. 

Dudley Warner, a nineteenth-century Connecticut journalist,

earned a sliver of immortality by coining the phrase "politics

makes strange bedfellows." This appeal, which forges an

improbable alliance among such disparate groups as the National

Association of Social Workers, the Rhode Island State Rifle and

Revolver Association, the Rhode Island Affiliate of the American

Civil Liberties Union, the Rhode Island State Right to Life

Committee, Inc., the Coalition to Preserve Choice, the National

Education Association, and Ocean State Action, proves that the

aphorism still has force.

Here, the improbable allies (all private, non-profit

organizations) banded together with others to bring an action in

Rhode Island's federal district court against John B. Harwood,

Speaker of the Rhode Island House of Representatives (the House)

and Guido Petteruti, the House's head doorkeeper.1 The

plaintiffs challenged the constitutionality of House Rule 45 a

rule that purports to ban both lobbyists and lobbying from the

floor of the House while the House is in session on its face

and as applied. The district court found for most of the

plaintiffs and ordered the House to desist from continuing its

prevailing practices with regard to the interpretation and
 

1Other plaintiffs in the underlying action included several
individuals registered as lobbyists for non-profit organizations
(Kate Coyne-McCoy, Harvey Press, Scott Nova, Barbara Baldwin,
Susan Closter-Godoy, Steven Brown, Barbara Colt, Donn Dibiasio,
Anna Sullivan, and Marti Rosenberg), and three elected members of
the House (Edith Ajello, Barbara Burlingame, and Francis
Gaschen).

2

enforcement of Rule 45. See National Ass'n of Social Workers v. 

Harwood, 874 F. Supp. 530 (D.R.I. 1995) (Social Workers).2 

Given the benefit of briefing and argument on the doctrine of

legislative immunity a benefit denied to the distinguished

district judge, since the defendants inexplicably neglected to

raise the issue in the lower court we reverse.

I. BACKGROUND I. BACKGROUND

We recount the facts "in the light most hospitable to

the verdict-winner, consistent with record support." Cumpiano v. 

Banco Santander P.R., 902 F.2d 148, 151 (1st Cir. 1990). 

In January 1993, the House, under fresh leadership that

had pledged procedural reform, adopted several new rules. Among

them was Rule 45 (the full text of which is reproduced in the

appendix). On its face, Rule 45 banishes all lobbyists from the

floor of the House (and the House lounge) while the House is in

session. Nonetheless, the rule permits members of the public to

be on the House floor while the House is in session, provided

that "they remain seated along the sides of the chamber, refrain

from conversation, and maintain the decorum of the House," and

provided further that they do not "directly or indirectly engage

in the practice of lobbying." Rule 45(b).
 

2The district court nonetheless rebuffed the legislator-
plaintiffs, who claimed that Rule 45 violated their First
Amendment right to receive political information. The court
ruled that, even if the legislators had been denied some level of
access to lobbyists, the denial did not "rise[] to the level of a
constitutional deprivation." Social Workers, 874 F. Supp. at 
542. The legislator-plaintiffs have not appealed and,
accordingly, we confine our discussion to the claims brought by
the other plaintiffs.

3

Although Rule 45 does not define the term "lobbyist,"

it incorporates the statutory definition of "lobbying" contained

in the Rhode Island Lobbying Act, R.I. Gen. Laws 22-10-1 to

22-10-12 (the Act). The Act defines "lobbying" as "acting

directly or soliciting others to act for the purpose of

promoting, opposing, amending, or influencing in any manner the

passage by the general assembly of any legislation or the action

on that legislation by the governor." Id. 22-10-2. The Act 

requires lobbyists for private organizations and interests to

register with the Secretary of State, see id. 22-10-5 & 22-10- 

6, and to wear identifying badges, see id. 22-10-8. Government 

officials who lobby are given considerably more leeway. The Act

grants safe passage to many elected officials, see id. 22-10- 

3(1), and other public employees, while required to register, are

otherwise exempt from the Act's provisions. See id. 22-10-4.1. 

Neither elected officials nor other public employees are required

to wear identification badges.

The district court found that, prior to the adoption of

Rule 45, the House provided two galleries overlooking the chamber

which were accessible to all members of the public, lobbyists

included. In addition, "representatives of both private and

governmental organizations were allowed to be present on the

floor of the House." Social Workers, 874 F. Supp. at 535. These 

lobbyists typically occupied seats on the periphery, in an area

ranged alongside the two outermost aisles of the House floor.

They communicated with legislators in a variety of ways, such as

4

by whispered conversations on the perimeter of the House floor,

written notes, physical gestures, and other assorted signals.

See id. This buzznacking took place even while the members were 

debating floor amendments.

After the adoption of Rule 45, access to the overhead

galleries remained unchanged. But from that point forward, the

House excluded private lobbyists (easily recognized by their

obligatory identification badges) from the House floor while the

House was in session. The district court found that, in

contrast, "agents or employees of governmental bodies [were]

allowed to be present on the floor of the House while it [was] in

session, as [were] members of the general public." Id. 

Moreover, the "defendants permitted agents of governmental

organizations to be present, to speak, to respond to questions,

to provide information, and to confer with legislators on the

House floor during House sessions on frequent occasions,"

notwithstanding the apparently unconditional text of Rule 45.

Id. at 537. 

The plaintiffs struck back on April 27, 1993. On that

date, they filed a civil action under 42 U.S.C. 1983 (1988)

against Messrs. Harwood and Petteruti (as the individuals

purportedly responsible for enforcing the House's rules) charging

that Rule 45, on its face and as applied, violated the

plaintiffs' rights under the First and Fourteenth Amendments.

The defendants denied the allegations. Following a four-day

bench trial, the judge found for the plaintiffs. See National 

5

Ass'n of Social Workers v. Harwood, 860 F. Supp. 943 (D.R.I. 

1994). The defendants then moved to alter the judgment. While

that motion was under advisement, we decided AIDS Action Comm. v. 

Massachusetts Bay Transp. Auth., 42 F.3d 1 (1st Cir. 1994). The 

judge then issued the opinion that is now before us, 874 F. Supp.

530, modifying the original rescript in certain particulars.

In substance, the court found that the presence of the

general public on the perimeter of the House floor a presence

expressly permitted by Rule 45 constituted "communicative and

expressive activity," id. at 540; that, due to the communicative 

possibilities inherent in physical presence, the public's access

to the perimeter of the House floor rendered the floor itself a

limited-purpose public forum, see id.; and that, therefore, both 

Rule 45's exclusion of lobbyists and its proscription against

lobbying on the House floor constituted impermissible time,

place, and manner restrictions on expressive activity, see id. at 

540-41.3 On this basis, the court held that Rule 45, on its
 

3In the court's view, the rule did not "leave open ample
alternative means of communication for the lobbyists," Social 
Workers, 874 F. Supp. at 541, because "representatives elected to 
the Rhode Island House of Representatives are part time
legislators . . . [who] lack legislative office quarters in the
State House or elsewhere, [and who] lack legislative staffs, and
[who] generally have full time jobs in addition to their
legislative duties." Id. This meant, the court reasoned, that 
exclusion of the lobbyists denied them the opportunity to
communicate with hard-to-find legislators by way of silent
presence. See id. 
In condemning the ban on lobbying on the House floor during
House sessions, the court took a similar tack. It found that,
"with regard to floor amendments, which are often proposed and
voted on in the same House proceeding, the only timely and useful
communication that can take place is that which occurs on the
floor of the House, during the debate on the amendment." Id.  

6

face, violated the plaintiffs' First Amendment rights. See id. 

at 541.

The court also found that the House haphazardly

enforced Rule 45, allowing lobbying by government officials while

prohibiting others from lobbying. See id. at 535-37. Predicated 

on this finding, the court concluded that "the application of

Rule 45 amounts to a content based restriction on speech." Id. 

at 541. Because the court could discern no "compelling

government interest" that justified the exclusion of private

lobbying while sparing governmental lobbying, it held the

interpretation and enforcement of Rule 45 invalid under the First

Amendment. Id. at 541-42. 

In constructing a remedy, the judge, presaging an issue

not yet raised by the parties, voiced concerns about judicial

interference in legislative affairs. See id. at 542. He 

therefore declined the plaintiffs' invitation to "require

defendants to return to the pre-1993 practice of admitting all

lobbyists, public and private, onto the floor of the House on a

first-come, first-served basis." Id. Instead, he opted to 

declare "the current interpretation and enforcement of Rule 45

unconstitutional," and to order the House to refrain from

"continuing its current practices with regard to this issue."

Id. at 543.4 The House leadership responded on two levels: the 
 

4For reasons that are not readily apparent to us, the
plaintiffs never sued the House as a body and, therefore, the
district court plainly lacked jurisdiction to enjoin the House.
The plaintiffs now concede that, insofar as the lower court
purported to do so, its order cannot stand. Withal, the

7

House itself passed a new rule barring all persons except

legislators and legislative aides from the House floor, and the

named defendants launched this appeal.

II. PROCEDURAL DEFAULT II. PROCEDURAL DEFAULT

On appeal, the defendants, having engaged new counsel,

advance a point that, for some unfathomable reason, they

neglected to raise below: the claim that, with regard to the

defendants' actions anent Rule 45, they are safeguarded from

judicial interference under the federal common law doctrine of

absolute legislative immunity. The State of Rhode Island,

through its Attorney General, as amicus curiae, lends its

support.

It is very late in the day to bring a new argument to

the fore. Ordinarily, an appellant who has not proffered a

particular claim or defense in the district court "may not unveil

it in the court of appeals." United States v. Slade, 980 F.2d 

27, 30 (1st Cir. 1992). This rule is deeply embedded in our

jurisprudence, see, e.g., Teamsters, Chauffeurs, Warehousemen and 

Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 

17, 21 (1st Cir. 1992) ("If any principle is settled in this

circuit, it is that, absent the most extraordinary circumstances,

legal theories not raised squarely in the lower court cannot be

broached for the first time on appeal."), and we have invoked it
 

plaintiffs argue that the court's underlying ruling that Rule
45 is unconstitutional may endure, as the court had
jurisdiction over the individuals charged with the rule's
enforcement. For reasons which more clearly appear infra, we 
need not unsnarl this tangle.

8

with a near-religious fervor, see, e.g., McCoy v. Massachusetts 

Inst. of Technology, 950 F.2d 13, 22 (1st Cir. 1991) (collecting 

cases), cert. denied, 504 U.S. 910 (1992). Nor can this variant 

of the raise-or-waive principle be dismissed as a pettifogging

technicality or a trap for the indolent; the rule is founded upon

important considerations of fairness, judicial economy, and

practical wisdom. See, e.g., Sandstrom v. Chemlawn Corp., 904 

F.2d 83, 87 (1st Cir. 1990); United States v. Miller, 636 F.2d 

850, 853 (1st Cir. 1980). Thus, parties must speak clearly in

the trial court, on pain that, if they forget their lines, they

will likely be bound forever to hold their peace. This is as it

should be: the rule fosters worthwhile systemic ends and courts

will be the losers if they permit it to be too easily evaded.

But foolish consistency is reputedly the hobgoblin of

little minds, see Ralph Waldo Emerson, "Self Reliance," in 

Essays: First Series (1841), and in the last analysis, this 

articulation of the raise-or-waive principle, though important,

is a matter of discretion. See United States v. La Guardia, 902 

F.2d 1010, 1013 (1st Cir. 1990) (holding that "an appellate court

has discretion, in an exceptional case, to reach virgin issues");

accord Singleton v. Wulff, 428 U.S. 106, 121 (1976); United 

States v. Mercedes-Amparo, 980 F.2d 17, 18-19 (1st Cir. 1992); 

United States v. Krynicki, 689 F.2d 289, 291-92 (1st Cir. 1982). 

Thus, this rule (like most rules) admits of an occasional

exception. "Occasional" is the key word. Since exceptions must

be few and far between, an appellate court's discretion should

9

not be affirmatively exercised unless the equities heavily

preponderate in favor of such a step.

In the La Guardia and Krynicki opinions, we set forth 

guidelines that suggest when it may be appropriate to invoke the

exception, and we need not rehearse the litany. Instead, we

explain why those criteria are satisfied here, and, in the

process, explicate the criteria themselves.

First, this is not a case in which, by neglecting to

raise an issue in a timely manner, a litigant has deprived the

court of appeals of useful factfinding. The court below made a

number of findings as to the appellants' conduct in interpreting

and enforcing Rule 45, and addressing the omitted issue requires

only that we determine whether the described conduct, giving full

deference to these factual findings, falls within the established

boundaries of legislative immunity. Thus, it can fairly be said

that the omitted issue is purely legal in nature, and lends

itself to satisfactory resolution on the existing record without

further development of the facts. These attributes ease the way

for invoking the exception. See La Guardia, 902 F.2d at 1013; 

Krynicki, 689 F.2d at 291-92. 

Second, appellants' belated proffer "raises an issue of

constitutional magnitude," a factor that favors review

notwithstanding the procedural default. La Guardia, 902 F.2d at 

1013. Third, the omitted argument is "highly persuasive,"

Krynicki, 689 F.2d at 292, a circumstance that "often inclines a 

court to entertain a pivotal argument for the first time on

10

appeal," La Guardia, 902 F.2d at 1013, particularly when 

declining to reach the omitted argument threatens "a miscarriage

of justice," Krynicki, 689 F.2d at 292.5 Fourth, we see no 

special prejudice or inequity to the plaintiffs. The omitted

defense is law-based, not fact-based. In addition, the parties

have joined issue; the claim of legislative immunity was made in

full in the appellants' opening brief in this court, the

plaintiffs responded to it in extenso, and both sides addressed 

the point during oral argument. The absence of unfairness has a

definite bearing on a decision to overlook this type of

procedural default. See United States v. Doe, 878 F.2d 1546, 

1554 (1st Cir. 1989); cf. Singleton, 428 U.S. at 120 (discussing 

importance, in determining whether to reach the merits of an

omitted issue, of ensuring that the opposing party "ha[s] the

opportunity to present whatever legal arguments he may have" to

the court of appeals). Fifth, the omission seems entirely

inadvertent rather than deliberate; although withholding the

argument had the regrettable effect of blindsiding the district

 

5In this context, "miscarriage of justice" means more than
the individualized harm that occurs whenever the failure
seasonably to raise a claim or defense alters the outcome of a
case. Rather, courts ordinarily will relax the raise-or-waive
principle on this basis only if a failure to do so threatens the
frustration of some broadly important right. See Schlesinger v. 
Councilman, 420 U.S. 738, 743 (1975) (holding that, when 
"jurisdictional and equity issues . . . [are] sufficiently
important," courts may consider issues on appeal that were not
raised below); Krynicki, 689 F.2d at 292 (explaining that the 
interest at stake must be "legitimate and significant"). For
this reason, courts often are more prone to make the infrequent
exception in cases that involve a discernible public interest,
and less prone to do so in disputes between private parties.

11

judge and needlessly prolonging the litigation, it yielded no

tactical advantage to the defendants.

Sixth and perhaps most salient the omitted issue

implicates matters of great public moment, and touches upon

policies as basic as federalism, comity, and respect for the

independence of democratic institutions. Courts must be

sensitive to such concerns. See Stone v. City and County of San 

Francisco, 968 F.2d 850, 855 (9th Cir. 1992) (explaining the 

court's election to address a matter first raised on appeal

because "[i]ssues touching on federalism and comity may be

considered sua sponte"), cert. denied, 113 S. Ct. 1050 (1993). 

We believe that this sensitivity is appropriately expressed by a

frank recognition that, when institutional interests are at

stake, the case for the favorable exercise of a court's

discretion is strengthened, and waiver rules ought not to be

applied inflexibly.6 See, e.g., Hoover v. Wagner, 47 F.3d 845 

(7th Cir. 1995) (suggesting that "when matters of comity are

involved, the ordinary doctrines of waiver give way"); Jusino v. 
 

6Our belief that the defendants should not be strictly held
to a waiver of their absolute legislative immunity in this case
is fortified by our recognition that a primary purpose of the
immunity is to prevent courts from intruding into precincts that
are constitutionally reserved to the legislative branch.
Overlooking a waiver in order to further this policy of non-
interference is analogous to our settled rule that, because
federal courts are courts of limited jurisdiction, the absence of
federal subject matter jurisdiction can be raised on appeal even
if the issue was not raised below. See, e.g., American 
Policyholders Ins. Co. v. Nyacol Prods., Inc., 989 F.2d 1256, 
1258 (1st Cir. 1993), cert. denied, 114 S. Ct. 682 (1994). In 
both situations, looking past the waiver has the salutary effect
of ensuring that federal courts do not poach on preserves that
the Constitution reserves to other forms of oversight.

12

Zayas, 875 F.2d 986, 993 (1st Cir. 1989) (discussing court's 

reluctance to apply waiver rules concerning "a line of defense

that calls into play the Commonwealth's Eleventh Amendment

immunity"); cf. Granberry v. Greer, 481 U.S. 129, 134 (1987) 

(explaining that, when a state fails to raise a nonexhaustion

claim in a federal habeas proceeding, the federal tribunal

nonetheless should consider "whether the interests of comity and

federalism will be better served . . . by requiring

[exhaustion]").

Here, an important issue of public concern confronts

us. It is presented belatedly, but in a posture that permits its

proper resolution on the existing record and works no unfair

prejudice to the opposing parties. Failure to address the issue

may well result in an unwarranted intrusion by a federal court

into the internal operations of a state legislature. Under these

exceptional circumstances, we follow the course of perceived duty

and proceed, in the exercise of our discretion, to weigh the

legislative immunity argument.7 See La Guardia, 902 F.2d at 
 

7The dissent's principal response to this reason seems to be
that overlooking the waiver "eliminates any incentive" for
legislators to raise the immunity defense in a timely manner.
Post at 39-40. This reasoning strikes us as triply flawed. In 
the first place, that argument can be used with equal force as to
virtually all omitted defenses; its logical extension is that all
waivers should rigorously be enforced. That view has much to
commend it as a matter of case management, but, as La Guardia, 
Krynicki, Mercedes-Amparo, Hoover, and Stone illustrate, it is 
simply not the law.
In the second place, the argument underestimates the
capabilities of appellate courts. There is no hint of a
deliberate bypass in this case the belated tender of the
defense is the product of a change in counsel (coupled with the
appearance of Rhode Island's Attorney General as an amicus)

13

1013 ("Rules of practice and procedure are devised to promote the

ends of justice, not to defeat them.") (quoting Hormel v. 

Helvering, 312 U.S. 552, 557 (1941)). 

III. THE MERITS OF THE OMITTED DEFENSE III. THE MERITS OF THE OMITTED DEFENSE

We bifurcate our analysis of the legislative immunity

defense, first discussing the general nature and scope of the

doctrine and then addressing the specific contours of the

appellants' claim.

A. Legislative Immunity: In General. A. Legislative Immunity: In General. 

The Speech or Debate Clause commands that "for any

Speech or Debate in either House, [Senators and Representatives]

shall not be questioned in any other place." U.S. Const. art. I,

6, cl. 1. The Clause is, by its terms, limited to members of

Congress. See Lake County Estates v. Tahoe Regional Planning 

Agency, 440 U.S. 391, 404 (1979). Nevertheless, state 

legislators and their surrogates enjoy a parallel immunity from

liability for their legislative acts.

While this immunity is derived from federal common law,

it is similar in scope and object to the immunity enjoyed by

federal legislators under the Speech or Debate Clause. When the

Justices initially recognized state legislative immunity as a
 

rather than a change in tactics or a reassessment of political
costs and, if sandbagging were to occur, we have confidence
that this court would see it for what is was, and decline to
exercise discretion in favor of the sandbagger.
Finally, if we assume that the dissent is correct and that
our ruling today may encourage legislator-litigants to withhold
immunity defenses for political reasons, that is still the lesser
evil, far preferable in our view to the unwarranted insertion of
the federal court's nose into the state legislature's tent.

14

component of federal common law, they turned to the Speech or

Debate Clause for guidance anent the contours of the doctrine.

See Tenney v. Brandhove, 341 U.S. 367, 376-79 (1951). Later, the 

Court acknowledged that the immunities enjoyed by federal and

state legislators are essentially coterminous. See Supreme Court 

of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732-33 

(1980). Hence, our exploration of the appellants' legislative

immunity claim begins with a distillation of principles extracted

from federal constitutional jurisprudence.

The Speech or Debate Clause has its roots in a similar

provision found in the English Bill of Rights of 1689.8 See 

United States v. Johnson, 383 U.S. 169, 177-78 (1966); Tenney, 

341 U.S. at 372. The Clause is modeled to ensure that the

Legislative Branch will be able to perform without undue

interference the whole of the legislative function ceded to it by

the Framers. See Eastland v. United States Serviceman's Fund, 

421 U.S. 491, 502 (1975). To that end, the Clause operates to

shelter individual legislators from the distractions and

hindrance of civil litigation, see id. at 503, and "immunizes 

[them] from suits for either prospective relief or damages,"

Consumers Union, 446 U.S. at 731. 

While the core protection conferred by the Clause

concerns speech or debate by a member of Congress on the floor of

 

8The British version provides: "That the Freedom of Speech,
and Debates or Proceedings in Parliament, ought not to be
impeached or questioned in any Court or Place out of Parliament."
1 Wm. & Mary, Sess. 2, ch. II (1689).

15

either the Senate or the House, see Gravel v. United States, 408 

U.S. 606, 625 (1972), the penumbra of the Clause sprawls more

broadly. This breadth of application, which draws its essence

from the Supreme Court's espousal of a "practical rather than a

strictly literal reading" of the Clause, Hutchinson v. Proxmire, 

443 U.S. 111, 124 (1979), is made manifest in two ways. For one

thing, the Clause's prophylaxis extends to any act "generally

done in a session of the House by one of its members in relation

to the business before it." Kilbourn v. Thompson, 103 U.S. 168, 

204 (1880). So read, the Clause protects not only speech and

debate per se, but also voting, see id., circulation of 

information to other legislators, see Doe v. McMillan, 412 U.S. 

306, 312 (1973), participation in the work of legislative

committees, see Gravel, 408 U.S. at 624; Tenney, 341 U.S. at 378- 

79, and a host of kindred activities.

For another thing, because the applicability of the

Speech or Debate Clause necessarily focuses on particular acts or

functions, not on particular actors or functionaries, the

prophylaxis of the Clause also extends to legislative acts

performed by non-legislators. See Eastland, 421 U.S. at 507 

(refusing to draw a distinction between the members of a

congressional subcommittee and the subcommittee's counsel when

the latter's actions were within the sphere of legitimate

legislative activity); Gravel, 408 U.S. at 618 (holding that "the 

Speech or Debate Clause applies not only to a Member but also to

his aides insofar as the conduct of the latter would be a

16

protected legislative act if performed by the Member himself").

This extension evinces a recognition that, as a practical matter,

legislators cannot be expected to perform their constitutionally

allocated tasks without staff support.

This is not to say that the protections afforded by the

Speech or Debate Clause are limitless. They are not. See 

Gravel, 408 U.S. at 625. Although the Court has read the Clause 

generously, its protections must match its purposes. See 

Eastland, 421 U.S. at 501-02. When all is said and done, the 

absolute immunity conferred by the Clause is not afforded "simply

for the personal or private benefit of Members of Congress, but

to protect the integrity of the legislative process by insuring

the independence of individual legislators." United States v. 

Brewster, 408 U.S. 501, 507 (1972). 

The key limitation which applies both to members of

Congress and to congressional staffers is that the Clause

protects "only purely legislative activities." Id. at 512. If a 

legislator (or his surrogate) undertakes actions that are only

"casually or incidentally related to legislative affairs," id. at 

528, or which fall outside the "legitimate legislative sphere,"

Eastland, 421 U.S. at 503 (citation omitted), no immunity 

inheres. By the same token, the mere fact that a legislator or a

legislative aide performs an act in his official capacity does

not automatically confer protection under the Speech or Debate

Clause. See Gravel, 408 U.S. at 625. For example, when a member 

of Congress disseminates press releases to the public, the Clause

17

does not attach because such documents are "primarily means of

informing those outside the legislative forum." Hutchinson, 443 

U.S. at 133. So, too, activities that are more political than

legislative in nature do not come within the legislative sphere,

and, hence, do not implicate the Speech or Debate Clause. See 

Brewster, 408 U.S. at 512. These activities include such 

familiar fare as "legitimate `errands' performed for

constituents, the making of appointments with Government

agencies, [and] assistance in securing Government contracts."

Id. 

B. Legislative Immunity: In Particular. B. Legislative Immunity: In Particular. 

We now turn to the merits of appellants' assertion

that, under federal common law, the instant action founders on

the shoals of absolute legislative immunity. The plaintiffs

brought suit, as we have said, under 42 U.S.C. 1983. In

actions invoking federal civil rights statutes, federal courts

customarily "equate[] the legislative immunity to which state

legislators are entitled . . . to that accorded Congressmen under

the Constitution." Consumers Union, 446 U.S. at 733. Viewed 

against this backdrop, it is unsurprising that the courts of

appeals historically have relied on Speech or Debate Clause

precedents to define the doctrinal boundaries of state

legislative immunity under the federal common law. See, e.g., 

Schlitz v. Commonwealth of Va., 854 F.2d 43, 45-46 (4th Cir. 

1988); Agromayor v. Colberg, 738 F.2d 55, 58-59 (1st Cir.), cert. 

denied, 469 U.S. 1037 (1984); Colon Berrios v. Hernandez Agosto, 

18

716 F.2d 85, 89-90 (1st Cir. 1983) (per curiam); Green v. DeCamp, 

612 F.2d 368, 371-72 (8th Cir. 1980). Thus, our mode of analysis

dovetails with the Speech or Debate Clause cases.

At the heart of our inquiry lies the question of

whether appellants' acts in respect to Rule 45 are "part and

parcel of the legislative process." Gravel, 408 U.S. at 626. If 

so, appellants are protected. See id. To answer this question, 

we must understand the nature of the acts.9 We can look at them

in one of two ways.

In a general sense, the defendants the Speaker and

the head doorkeeper did nothing more or less than to interpret

and enforce Rule 45. Where, as here, a legislative body adopts a

rule, not invidiously discriminatory on its face, see infra pp. 

26-28, that bears upon its conduct of frankly legislative

business, we think that the doctrine of legislative immunity must

protect legislators and legislative aides who do no more than

carry out the will of the body by enforcing the rule as a part of

 

9In certain types of cases, the legislative immunity
analysis centers on function, attempting to ascertain whether an
action by one or more legislators is administrative or
legislative in nature. See, e.g., Negron-Gaztambide v. 
Hernandez-Torres, 35 F.3d 25, 27-28 (1st Cir. 1994) (holding that 
legislators' decision to discharge librarian was administrative
in nature, and did not give rise to legislative immunity). Here,
however, we are dealing with a procedural rule adopted by a house
of the legislature as a whole for the management of its own
business. Hence, we are not concerned with whether the adoption
of the rule comprises a legislative act that is transparently
clear but, rather, with whether that act is more than "casually
or incidentally related" to core legislative functions.
Brewster, 408 U.S. at 528. 

19

their official duties.10 See Consumers Union of the U.S. v. 

Periodical Correspondents' Ass'n, 515 F.2d 1341, 1348-50 (D.C. 

Cir. 1975) (holding congressional employees' actions in enforcing

Congress's internal seating regulations immune under Speech or

Debate Clause), cert. denied, 423 U.S. 1051 (1976); see also 

Davids v. Akers, 549 F.2d 120, 123 (9th Cir. 1977) (dismissing 

action challenging internal rules for committee assignments

brought by members of the Arizona House of Representatives

against the Speaker); cf. R.I. Const. art. VI, 7 (expressly 

authorizing the House to "determine its rules of proceeding").

The short of it is that the doctrine of legislative immunity,

like the Speech or Debate Clause, attaches when solons' actions

are "an integral part of the deliberative and communicative

processes by which Members participate in committee and House

proceedings with respect to the consideration and passage or

rejection of proposed legislation or with respect to other

matters [committed to their jurisdiction]." Gravel, 408 U.S. at 

625.

In a more specific sense, it might be said that the
 

10We reject the plaintiffs' attempt to differentiate the
Speaker from the doorkeeper, based on the fact that the latter is
not a legislator. The case law teaches that, as long as an
aide's conduct would be covered by legislative immunity were the
same conduct performed by the legislator himself, the aide shares
the immunity. See Eastland, 421 U.S. at 507; Gravel, 408 U.S. at 
616; Consumers Union of the U.S. v. Periodical Correspondents' 
Ass'n, 515 F.2d 1341, 1348-50 (D.C. Cir. 1975), cert. denied, 123 
U.S. 1051 (1976). Petteruti's actions in keeping the House floor
unsullied were performed by virtue of an express delegation of
authority to him as part of the House's staff support apparatus,
under the auspices of the Speaker and the legislative body as a
whole. No more is exigible.

20

district court granted relief because it found Rule 45 to be

fatally deficient in three particulars: (1) on its face, Rule 45

transgressed the First Amendment by banning lobbying on the floor

of the House while the House is in session; (2) on its face, Rule

45 transgressed the First Amendment by banishing all lobbyists

from the perimeter of the House; and (3) the appellants

interpreted, applied, and enforced Rule 45 to allow governmental

lobbyists onto the House floor while denying comparable access to

private lobbyists. Assuming for argument's sake that this

narrower perspective is relevant, the question of whether the

appellants are entitled to legislative immunity would be reduced

to a question of whether the acts which the district court found

problematic fell within or without "the legitimate legislative

sphere." Eastland, 421 U.S. at 503. 

The first area of inquiry can celeritously be

dispatched. We think it is beyond serious dispute that enforcing

a duly enacted legislative rule which prohibits lobbying on the

House floor during House sessions is well within the legislative

sphere. Such a restriction necessarily affects the manner in

which the House conducts its most characteristic legislative

functions, e.g., debating and voting. A rule that colors the 

very conditions under which legislators engage in formal debate

is indubitably part and parcel of the legislative process, and

the acts of House officials (whether or not elected members) in

enforcing it are therefore fully protected against judicial

interference by the doctrine of legislative immunity. See id.; 

21

see also Doe, 412 U.S. at 312-13; Tenney, 341 U.S. at 378-79. 

At first blush, the next area of inquiry whether the

exclusion of all lobbyists from the perimeter of the House is

within the legislative sphere appears more murky. Seating

arrangements for non-legislators arguably are less integral to

the legislative process than the regulation of lobbying during

House sessions. As the trial testimony in this case amply

demonstrates, however, when lobbyists are present on the House

floor (even on the perimeter), they often become embroiled in the

legislative process either through self-initiated or legislator-

initiated contacts. And, even if lobbyists are able to maintain

stoic silence on the perimeter, their mere presence affects the

legislative environment.11 We conclude, therefore, that

regulation of admission to the House floor comprises "an integral

part of the deliberative and communicative processes by which

Members participate in . . . House proceedings with respect to

the consideration and passage or rejection of proposed

legislation." Gravel, 408 U.S. at 625. Consequently, the 

doctrine of legislative immunity pertains.

We are not alone in our view of a legislature's House

 

11The plaintiffs themselves have argued, in the context of
their First Amendment claim, that they should at least be given
the opportunity to sit silently on the perimeter of the House
floor so that they may communicate through their physical
presence. The district court accepted this argument, and made it
a cornerstone of the ensuing First Amendment analysis. See 
Social Workers, 874 F. Supp. at 539-41. The importance that the 
plaintiffs attach to admittance to the perimeter indicates their
own recognition that, by mere physical presence, they can
influence ongoing legislative business.

22

as its castle. In Periodical Correspondents', the court reached 

a similar conclusion. There, the Periodical Correspondents'

Association, which issues credentials to the press galleries of

Congress, denied accreditation to a particular periodical,

Consumer Reports, on the ground that it had ties to an advocacy

organization. Consumers Union sued the sergeants-at-arms of the

House and Senate, among other defendants, alleging that the

exclusion violated the First Amendment. The court held that the

sergeants-at-arms were immune under the Speech or Debate Clause

because arrangements for seating the press in the House and

Senate galleries were "integral" to "the legislative machinery."

515 F.2d at 1350. In a later case, the court elaborated its

rationale, explaining that the seating "immediately concerned

House consideration of proposed legislation" because the

arrangements "were intended to shield members of Congress from

press members' use of their House access to lobby legislators."

Walker v. Jones, 733 F.2d 923, 930 (D.C. Cir.) (discussing 

Periodical Correspondents'), cert. denied, 469 U.S. 1036 (1984). 

Like the seating arrangements at issue in Periodical 

Correspondents', the seating arrangements dictated by Rule 45 

involve the "regulation of the very atmosphere in which lawmaking

deliberations occur." Walker, 733 F.2d at 930. Moreover, if 

there is a distinction between Periodical Correspondents' and the 

instant case, it does not advantage the present plaintiffs; the

Rhode Island House is seeking to regulate access to its own

floor, rather than to galleries located above the floor.

23

We come now to the third area of inquiry, involving the

significance, if any, of the plaintiffs' claim that the

appellants interpreted and enforced Rule 45 in a manner that

allowed lobbying on the House floor by governmental, but not

private, lobbyists. This as-applied exclusion of private

lobbyists, at its most primitive level, involves regulating the

legislative environment by controlling access to the seating on

the perimeter of the House floor. Because such regulation is

"done in a session of the House by one of its members in relation

to the business before it," Kilbourn, 103 U.S. at 204, it is 

within the legislative sphere.

To be sure, both our dissenting colleague and the

plaintiffs protest that the House treats private lobbyists

differently (and less hospitably) than public lobbyists, and that

this differential treatment offends the First Amendment. These

charges lack sufficient force to strip away the shield of

absolute legislative immunity.

We believe that the body of our opinion adequately

rebuts the dissent's views, and we decline to repastinate well-

ploughed ground. We do add, however, our belief that the dissent

seriously misconstrues the Court's Speech or Debate Clause

jurisprudence beyond all recognition. To the extent that Powell 

can be read to hold that legislative immunity does not extend to

legislative employees, the Court in later cases has routinely

confined it to its unique facts. See, e.g., Gravel, 408 U.S. at 

621 (specifically identifying Kilbourn, Powell, and Dombrowski v. 

24

Eastland, 387 U.S. 82 (1967), and stating that none "of these 

cases adopted the simple proposition that immunity was

unavailable to congressional or committee employees because they

were not Representatives or Senators"). Rather, the case law

"reflect[s] a decidedly jaundiced view towards extending the

Clause so as to privilege illegal or unconstitutional conduct

beyond that essential to foreclose executive control of

legislative speech or debate and associated matters such as

voting and committee reports and proceedings." Id. We see no 

reason why judicial control of legislative speech or debate is

any less pernicious than executive control. Moreover, the

decision not to extend legislative immunity to congressional

employees in cases such as Powell turned on whether "relief could 

be afforded without proof of a legislative act or the motives or

purposes underlying such an act," thereby avoiding impermissible

encroachment on "legislative independence." Id. at 620. Under 

that standard, judicial review of House Rule 45 as the tortured

course of the proceedings below graphically illustrates 

unquestionably required a substantial judicial intrusion into the

legislative domain. Finally, we recognize, as the dissent points

out, that the Court has remarked an exception to legislative

immunity for the exercise by legislators of punitive enforcement 

authority outside the ambit of purely legislative proceedings.

See Consumers Union, 446 U.S. at 736. But the Court has never 

suggested, much less held, that the enforcement of a rule adopted

by an entire legislative body designed to govern the conduct of

25

legislative proceedings falls within that exception. If that

were the rule, legislative immunity would be little more than a

rumor, and the Speech or Debate Clause would be easily skirted.

Similarly, the plaintiffs' "as-applied" arguments are

unavailing. In Eastland v. United States Servicemen's Fund, 

supra, the plaintiffs asseverated that "once it is alleged that 

First Amendment rights may be infringed by congressional action

the Judiciary may intervene to protect [First Amendment] rights."

421 U.S. at 509. The Court flatly rejected this asseveration,

warning that the effort to carve out such an exception "ignores

the absolute nature of the speech or debate protection and [the]

cases which have broadly construed that protection." Id. at 509- 

10. The Court added: "Where we are presented with an attempt to

interfere with an ongoing activity by Congress, and that activity

is found to be within the legitimate legislative sphere, [First

Amendment] balancing plays no part." Id. at 510 n.16. The Ninth 

Circuit put matters even more bluntly, writing that "nothing in

the First or Fourteenth Amendments or in 42 U.S.C. 1983 . . .

can justify [an] attempt to inject the Federal Judiciary into the

internal procedures of a House of a state legislature." Davids, 

549 F.2d at 123.

The plaintiffs' also assert that the differential

treatment of public and private lobbyists violates the Equal

Protection Clause. This assertion does not derail the engine of

legislative immunity. Activities that comprise part and parcel

of the legislative process are protected by legislative immunity;

26

that immunity is not forfeited simply because the activities, if

unprotected, might violate a plaintiff's constitutional rights.

See Doe, 412 U.S. at 312-13; see also Colon Berrios, 716 F.2d at 

91. Thus, in Doe, the Supreme Court ruled that the Speech or 

Debate Clause shields legislators' actions "within the

legislative sphere, even though [the] conduct, if performed in

other than legislative contexts, would in itself be

unconstitutional." 412 U.S. at 312-13 (internal citation and

quotation marks omitted).

For obvious reasons, the plaintiffs chafe at the broad

sweep of the doctrine of legislative immunity, and, in struggling

to make their point, they marshal a parade of horribles. To cite

a typical example, they raise the specter of a hypothetical

legislature that votes to allow access to its chambers to members

of only one race or to adherents of only one religion.

The plaintiffs have the right to march, but their

parade is on the wrong route. The Court has explicitly

recognized that there may be some conduct, even within the

legislative sphere, that is so flagrantly violative of

fundamental constitutional protections that traditional notions

of legislative immunity would not deter judicial intervention.

See, e.g., Kilbourn, 103 U.S. at 204 (leaving open the question 

of whether "there may not be things done, in the one House or the

other, of an extraordinary character, for which the members who

take part in the act may be held legally responsible"); see also 

Tenney, 341 U.S. at 379 (Black, J., concurring) (recognizing that 

27

the Court's jurisprudence "indicates that there is a point at

which a legislator's conduct so far exceeds the bounds of

legislative power that he may be held personally liable in a suit

brought under the Civil Rights Act"). Whatever may be the outer

limits of the doctrine of legislative immunity, however, it is

clear that the instant case is not so extreme as to cross (or

even closely approach) the border.

Taking the district court's factual findings at face

value, Rule 45, as applied, may arguably be wrong as a matter of

policy and as a matter of constitutional law but it is not

invidiously discriminatory. To the contrary, the differentiation

between private and public lobbyists appears to be based on two

factors that bear some rational relationship to legitimate 

legislative purposes. First, the House leadership explained

that, in its view, the exclusion of private lobbyists from the

floor was a useful tool to bolster public confidence in

legislative independence and integrity.12 Second, the
 

12In a debate over a motion to reconsider Rule 45, the
Majority Leader, Representative George Caruolo, stated:

This isn't trying to retard lobbyists from
pursuing their vocation . . . It's a rule
that says, quite simply, this is the people's
chamber, the public is invited. But the
business of the people should be conducted by
the people's representatives. It should not
be in any way affected by people who are
registered to advocate particular positions,
whether they are paid or unpaid . . . .

Later, Representative Caruolo explained why he thought
that governmental lobbyists on the floor of the House do not
trigger the same public perceptions as private lobbyists:

28

defendants consistently have taken the position that government

lobbyists act in effect as support staff for legislators by

giving them neutral statistical and factual information relevant

to pending legislation. These justifications for the continued

presence of government lobbyists, found by the district court to

be authentic (if asthenic), see Social Workers, 874 F. Supp. at 

541-42, afford a sufficiently rational basis to persuade us that

this case does not give rise to the question reserved by the

Kilbourn Court.13 

Thus, we conclude that, insofar as the appellants

enforced Rule 45's prohibitions against private lobbyists, but

spared governmental lobbyists from exclusion, they acted within

the legislative sphere and are protected from judicial
 

[A]ny general officer or any government
employee who is here, working in this
building [the State House] on government
policy they're paid by the government. We
are the government. That's the distinction .
. . Let's not have private groups out here
trying to manipulate this floor while we are
taking votes.

In the same vein, Edward Clement, the House's legislative
coordinator, testified that he did not consider government
lobbyists to be lobbyists per se, but, rather, "people called [to
the floor] by members of the House for informational purposes."
Speaker Harwood echoed the same themes, describing the principal
spokesman for the state Budget Office as "a dollars-and-cents
guy. . . . a resource factual guy," in contradistinction to "a
lobbying, influence guy."

13This conclusion is not undermined by the lower court's
determination that these reasons were insufficient to warrant an
infringement on the First Amendment rights of private lobbyists.
See Social Workers, 874 F. Supp. at 541-42. Such rigorous 
testing, appropriate in the First Amendment context, is out of
place in the context of legislative immunity. See Eastland, 421 
U.S. at 509 n.16.

29

interference by the doctrine of absolute legislative immunity.

IV. CONCLUSION IV. CONCLUSION

We need go no further.14 In our republican system,

different institutions of government occupy different spheres.

Within its own domain, the legislative branch of a state

government is entitled to a reasonable measure of independence in

conducting its internal affairs. As a rule, a legislature's

regulation of the atmosphere in which it conducts its core

legislative activities debating, voting, passing legislation,

and the like is part and parcel of the legislative process,

and, hence, not subject to a judicial veto. See Eastland, 421 

U.S. at 509. Because Rule 45, and the defendants' actions in

interpreting and enforcing it, fit within the sweep of this

generality, the doctrine of absolute legislative immunity

requires that the federal courts refuse to entertain the suit.

Reversed. No costs. Reversed. No costs. 

Appendix follows; Dissenting opinion follows appendix  Appendix follows; Dissenting opinion follows appendix 

 

14We do not reach and, accordingly, express no opinion on,
the soundness of the district court's First Amendment analyses
and rulings.

30

APPENDIX APPENDIX

Text of Rule 45 Text of Rule 45 

SIXTHLY - OF ADMISSION TO THE FLOOR

45(a) The following persons shall be entitled
to admission to the floor of the House during
the session thereof: The Governor, the
Lieutenant Governor, the Secretary of State,
the Attorney General, the General Treasurer,
the state controller, and members of the
Senate, judges and ex-judges of the United
States court and of the state courts, ex-
governors, ex-Speakers of the House, ex-
members of the General Assembly,
representatives of the legislative council,
legislative staff, director of the department
of administration, the budget officer,
assistant in charge of law revision, and
clerks of the Senate and House committees,
superintendent of public buildings, state
librarian, and the authorized representatives
of the press, as provided in the rule next
following, and such other persons as shall be
admitted to the floor by the Speaker. At the
discretion of the Speaker, members of the
public may be admitted to the House floor,
provided, however, that all such persons may
not stay in the House chamber unless they
remain seated along the sides of the chamber,
refrain from conversation, and maintain the
decorum of the House. All persons who are
unable to access the House galleries by
reason of physical handicap shall be entitled
to admission to the House floor.

(b) Lobbyists including former state
legislators who are lobbyists shall not be
entitled to admission to the floor of the
House during the session thereof. No person
entitled to admission to the floor of the
House during the session thereof, shall
either directly or indirectly engage in the
practice of lobbying as defined in Rhode
Island General Laws (22-10-2).

(c) Admission to the House Lounge is limited
to House members and persons invited and
accompanied by a House member who will be

31

responsible for them while in the lounge.
Such persons when no longer accompanied by
the House member with whom they entered,
shall leave the lounge. No lobbyists shall
be admitted to the House lounge during the
House session.

32

LYNCH, Circuit Judge, dissenting. When the LYNCH, Circuit Judge, dissenting. 

government chooses to listen only to its own voice in the

political process by excluding the voices of private

citizens, core First Amendment values are violated. At the

heart of this case is not the ability of the Rhode Island

House to promulgate rules for the conduct of its own

business, but the defendants' actual practice, directly

contrary to the Rule adopted by the House, of excluding

speakers unless they represent the government and thus

express the government's own viewpoint. While, in my view,

the House could have legitimately closed the floor of its

Chamber to all who sought to influence its work, defendants

may not permit government lobbyists to lobby on the House

floor while prohibiting private citizens and private

lobbyists from doing the same. The First Amendment does not

permit the government to put its thumb on the scale in this

way and favor itself in the arena of political speech. With

respect, I dissent.

Unlike the majority, I would not take the

extraordinary step of affording defendants absolute

legislative immunity, thus preventing the court from reaching

the First Amendment issue. The majority does so in the name

of federalism and comity, important values to be sure. But

naming those values may obscure the issues involved here.

This case does not implicate traditional issues of

-33- 33

"federalism" at all, such as the limits on enumerated

congressional powers, see United States v. Lopez, 115 S. Ct. 

1624 (1995), or the relative allocation of legislative power

between state and federal governments, see U.S. Term Limits, 

Inc. v. Thornton, 115 S. Ct. 1842 (1995). Rather, this case 

raises thorny issues of the constitutional allocation of

powers between the people and those elected to represent

them, and of the appropriate role of federal courts in

resolving such issues. 

Facts 

Rule 45 on its face does not permit any lobbyists,

government or private, to be on the House floor and prohibits

lobbying on the floor by anyone, private citizen15 or

professional lobbyist, while the House is in session. It is

that Rule which reflects the decision of the House as to the

running of its affairs. Permitting government lobbyists to

lobby on the floor of the House violates the House Rule. 

The defendants claimed that such were not their

practices. But the district court, after trial, found to the

contrary and the defendants have not appealed from that

factual determination. The record amply demonstrates that

government lobbyists were regularly plying their trade on the

 

15. Under the terms of Rule 45, certain government officials
including the Governor, the Secretary of State, and the
Attorney General have access to the floor. The Rule
nonetheless prohibits anyone from lobbying.

-34- 34

floor after adoption of the House Rule which ostensibly kept

them out. And, as the district court found, defendants

"flagrantly permitted" such activities.

The Rhode Island House presents a factual setting

perhaps unique in this country. Unlike many legislative

bodies, including the United States Congress, most Rhode

Island legislators are part-time and have neither offices nor

staff. The House meets for six months or less in a year, and

then only for three or four afternoons and evenings a week.

Once the session starts, it rarely breaks until it is

concluded. Legislators typically arrive just in time for the

session and leave immediately on its conclusion. Legislators

have no desks other than their desks on the floor of the

Chamber. Often there is no other place but the floor for

direct communication with the legislators, apart from

disturbing legislators in their capacities as private

citizens where they live or work.

Amendments to bills are often introduced for the

first time on the floor. They are often unavailable to the

public before being introduced and are available only in the

House Chamber after being introduced. Frequently, especially

toward the close of the session, the House votes on such an

amendment on the same day, and sometimes within minutes, of

the amendment being introduced. 

-35- 35

Around the perimeter of the floor of the House

Chamber are approximately eighteen chairs. Some of those

chairs have been filled on a daily basis by government

lobbyists since Rule 45 was enacted. The remainder are

filled by members of the public. Private lobbyists are

relegated to balcony seating.

Government officials sitting in the perimeter seats

have and use a decided advantage in communicating with

legislators and in collecting and disseminating information.

Individual legislators frequently walk over to the perimeter

to speak with the government lobbyists. These lobbyists send

notes to legislators indicating that they would like to speak

and they get the attention of individual legislators by

signalling them. People seated along the perimeter of the

floor receive more information than others concerning floor

amendments, which are distributed to the legislators only

when they are introduced. Thus, government lobbyists who are

sitting on the floor can see copies of floor amendments and

have the opportunity to communicate their views, including

pertinent information, to the legislators. It is virtually

impossible for those who are not permitted onto the floor to

learn the exact language of an offered amendment because the

text of floor amendments is not distributed outside of the

Chamber.

-36- 36

Government lobbyists have actively lobbied for

their positions both from the perimeter seats and from the

floor itself. They have done so on bills which government

officials have supported and which private groups have

opposed. Those bills often concerned matters of great public

debate. For example, the topic of public funding of abortion

was taken up by the legislature. Agents of the Governor's

office, which supported such funding, sat on the floor and

talked to legislators while the lobbyist from the Rhode

Island State Right to Life Committee, Inc., which opposed

such funding, was relegated to the balcony. Similarly, the

Attorney General of Rhode Island introduced a bill to

reinstate the death penalty and he and his staff were on the

floor during debates on the bill, speaking with legislators.

Private group lobbyists opposed to the bill, including those

from the Rhode Island Affiliate of the American Civil

Liberties Union, could only watch from the balcony and were

precluded from the floor and from lobbying.

The same duality characterized the influencing of

bills on welfare reform. Government lobbyists from the

Department of Human Services were present for floor debates

on an amendment which would restore a General Public

Assistance program cut from the Governor's budget. The

Department favored elimination of the program. Lobbyists

from the National Association of Social Workers (NASW), which

-37- 37

opposed eliminating the program, were excluded. There was no

break in the session between the time the amendment was

introduced and it was voted upon. Similarly, in debate over

an amendment to an AFDC program, lobbyists for the Department

in the perimeter seats attempted to influence the vote, while

a NASW lobbyist in the balcony ineffectively tried to convey

the NASW's position by waving hands. Prison-related bills

received the same treatment. Department of Corrections

officials were on the floor with legislators during debate

while ACLU lobbyists who opposed the Department's position

watched ineffectively from the balcony. There were numerous

other instances where the Governor's Office, the State

Police, the Department of Economic Development, the Banking

and Insurance Department, the Fire Marshal, the General

Treasurer's Office and the Department of Business Regulation

lobbyists spoke directly with legislators on the floor

regarding pending legislation.16

Nor were the advantages given to government

lobbyists limited to lobbyists from state government

agencies. The lobbyist for the Mayor of Providence was on

the floor of the House every day, frequently conversing with

legislators. She spoke with legislators on issues as varied

 

16. The ability of government employees to sit in the few
perimeter seats may have been used to advance their personal
interests as well. For example, during debates on incentive
pay for court clerks, two court clerks sat in the aisle
seats.

-38- 38

as a proposed gun court, the Providence water supply, and

funding for the city.

Lobbying by government lobbyists at times took

place among the seats of the legislators, even with the

knowledge of the Speaker. For example, when the House was in

session, the Providence lobbyist was on a cellular telephone

and walked in between the rows of the legislators' seats,

passing the telephone to certain members of the House, who

listened and spoke into the telephone. The telephone was

eventually passed to the Speaker, who also listened, spoke

and chuckled. Only when a member of the House raised an

objection did the Providence lobbyist move to the outer

aisles. But she was not asked to leave the floor and was not

asked to refrain from speaking to the legislators.

Immunity 

I respectfully disagree with the decision of my

very able colleagues to afford absolute legislative immunity

to both of the defendants. Not only was the defense waived,

but even if it had been properly raised, the doctrine of

legislative immunity does not, in my view, foreclose a

judicial determination of the constitutionality of the

defendants' practices. The challenged practices do not

constitute the kind of "purely legislative activities" that

have traditionally triggered the protections of the

legislative immunity bar. Raising that bar in this case is

-39- 39

not necessary to vindicate the vital interests that the

doctrine was intended to safeguard, and indeed undercuts

those interests.

This case does not present the kind of exceptional

circumstances that would even permit consideration of the

defendants' legislative immunity arguments, because those

arguments were not raised in the district court. Cf. 

Eastland v. United States Servicemen's Fund, 421 U.S. 491, 

510 n.17 (1975) ("[T]he Speech or Debate Clause has never

been read so broadly that legislators are 'absolved of the

responsibility of filing a motion to dismiss.'" (citation

omitted)); Powell v. McCormack, 395 U.S. 486, 505 n.25 

(1969). Here, the immunity doctrine -- hardly an obscure

legal concept -- was never raised as a defense to liability,

even when the distinguished trial court was solicitous about

minimizing the intrusion of the litigation into the

functioning of the state legislature. Defendant Harwood is

himself an attorney and both defendants were ably represented

in the district court. I see no reason not to hold the

defendants to their waivers. See Singleton v. Wulff, 428 

U.S. 106, 121 (1976) (reversing court of appeals in a civil

case for deciding issues not argued in the district court).

In reaching the immunity issue, the majority sets

up a virtually no-lose proposition for legislators.

Legislators are certainly cognizant of the public perception

-40- 40

that raising an immunity defense is tantamount to a claim of

being above the Constitution. Thus, raising a defense of

legislative immunity at the outset of litigation is not

without its political costs. The majority's approach, which

permits the defense to be raised after trial, virtually 

eliminates any incentive to raise it sooner. If the trial

were to produce an unfavorable outcome, the legislator-

defendant could simply assert immunity on appeal, claiming

that the failure to raise the defense earlier had been

inadvertent. Because there rarely will be direct evidence to

counter such a claim of inadvertence, and because the defense

of absolute legislative immunity will always present a law-

based, potentially dispositive question of constitutional

magnitude, a court of appeals applying the majority's

approach would almost inevitably consider the defense, even

though raised for the first time on appeal.

Moreover, to the extent that one of the rationales

underlying legislative immunity is to prevent vexatious

litigation against legislators, that rationale is undermined

where (as here) the legislator-defendant goes through the

entire trial and raises the defense only on appeal. "The

purpose of the protection afforded legislators is not to

forestall judicial review of legislative action but to insure

that legislators are not distracted from or hindered in the

performance of their legislative tasks by being called into

-41- -41-

court to defend their actions." Powell, 395 U.S. at 505. 

Denials of legislative immunity are immediately appealable

because the immunity is not simply a defense to liability but

is also an immunity from suit. Helstoski v. Meanor, 442 U.S. 

500, 508 (1979). Appellate courts are unable to vindicate

that interest where defendants wait until after trial to

raise the immunity defense. See id. There thus may be a 

greater systemic interest in ensuring that the interest is

raised early.

Much of what the immunity protects cannot be

remedied here. Because the defendants never asserted a

defense of immunity, the action was fully tried before the

question was ever put to the district court. Legislators

have already testified. Deciding the merits of the

constitutional question entails no additional burden or

inconvenience upon the defendants. The need to ignore the

defendants' waiver in order to reach the immunity issue is,

as a result, greatly reduced.17

 

17. Even if one could overlook defendants' waiver, we could
not reach the immunity issue absent a showing of plain error
by the district court. Cf. United States v. Olano, 113 S. 
Ct. 1770, 1776-78 (1993); United States v. Saccoccia, 58 F.3d 
754, 790 (1st Cir. 1995). Plain error analysis does apply in
the civil context. See, e.g., Consolo v. George, 58 F.3d 
791, 793 (1st Cir. 1995) (jury instructions to which no
objection lodged subject only to plain error review); Lewis 
v. Kendrick, 944 F.2d 949, 953 (1st Cir. 1991) (district 
court's failure to grant qualified immunity reviewable only
for plain error where defense was not timely raised); Javelin 
Investment, S.A. v. Municipality of Ponce, 645 F.2d 92, 94-95 
(1st Cir. 1981) (same, for a sufficiency-of-evidence claim).

-42- -42-

Even overlooking the defendants' waiver, however, I

believe that their claim of absolute legislative immunity

fails. The Supreme Court's case law demonstrates that even

if a suit asserting individual rights could not be brought to

challenge a legislative act per se, it is not barred by 

legislative immunity if it merely seeks prospective relief

against a legislative employee for his role in carrying out

or enforcing the directives of that same legislative act.

That is precisely what the plaintiffs seek here.

There is no immunity for practices that simply

relate to legislative activities. See Doe v. McMillan, 412 

U.S. 306, 313 (1973) ("Our cases make perfectly apparent

. . . that everything a [legislator] may regularly do is not

a legislative act within the protection of the Speech or

Debate Clause."); United States v. Brewster, 408 U.S. 501, 

515 (1972) ("In no case has this Court ever treated the

Clause as protecting all conduct relating to the legislative 

process." (emphasis in original; footnote omitted)); Powell, 

395 U.S. at 503 ("Legislative immunity does not, of course,

bar all judicial review of legislative acts."). Moreover,

"[t]hat [legislators] generally perform certain acts in their

 

Whatever difference of opinion the question of legislative
immunity might allow, the district court's "failure" to
afford such immunity to defendants sua sponte was not clearly 
in error, and certainly did not produce a gross miscarriage
of justice or seriously affect the fairness, integrity or
public reputation of the judicial proceedings. See Olano, 
113 S. Ct. at 1779. There was no plain error.

-43- -43-

official capacity as [legislators] does not necessarily make

all such acts legislative in nature." Gravel v. United 

States, 408 U.S. 606, 625 (1972). Rather, as the majority 

agrees, the doctrine of legislative immunity protects "only

purely legislative activities." Brewster, 408 U.S. at 512; 

Chastain v. Sundquist, 833 F.2d 311, 314 (D.C. Cir. 1987) 

(quoting Brewster), cert. denied, 487 U.S. 1240 (1988). 

The basic protection of the doctrine of legislative

immunity attaches to actual "speech or debate" by

legislators. Gravel, 408 U.S. at 625. The Supreme Court has 

made clear that

[i]nsofar as [legislative immunity] is
construed to reach other matters, they 
must be an integral part of the 
deliberative and communicative processes 
by which [legislators] participate in 
committee and House proceedings with 
respect to the consideration and passage
or rejection of proposed legislation or
with respect to other matters [within the
legislature's constitutional
jurisdiction].

Hutchinson v. Proxmire, 443 U.S. 111, 126 (1979) (emphases in 

original) (quoting Gravel, 408 U.S. at 625). The majority 

does not dispute this definition of the scope of legislative

immunity.

It is important to recognize that the plaintiffs

here seek only to enjoin Rule 45's enforcement. In my view, 

legislative immunity does not reach enforcement of the House

Rule because such enforcement is not "an integral part of the

-44- -44-

deliberative and communicative processes" of the state

legislature.

Of course, the regulation of the admission of the

public to the House's floor has an important impact on the 

legislative process -- that is what this lawsuit is about.

But it belies common usage, I believe, to say that the

defendants' practices relating to the admission or exclusion

of classes of persons from the House floor constitute "an

integral part of the deliberative and communicative

processes" of the legislature. Certainly, such practices are

not part and parcel of the legislative process in the same

fashion as are the kinds of legislative acts to which the

Supreme Court has previously extended legislative immunity:

e.g., voting for a resolution, Kilbourn v. Thompson, 103 U.S. 

168, 204 (1881), making a speech on the floor, United States 

v. Johnson, 383 U.S. 169, 180 (1966), circulating documents 

to other legislators, McMillan, 412 U.S. at 312, or the 

gathering of information for a committee hearing, Dombrowski 

v. Eastland, 387 U.S. 82, 84 (1967) (per curiam).18 See 

 

18. An action challenging any of these immunized activities
would have required proof, as this case does not, of the
substance of a legislator's act -- e.g., how the legislator 
voted, or the content of a speech or the content of
communications to other legislators. See Gravel, 408 U.S. at 
618-21 (drawing this distinction); see also Brewster, 408 
U.S. at 526 (holding that act of bribery was not immune from
prosecution if government did not need to prove "how
[defendant] spoke, how he debated, how he voted, or anything
he did in the chamber or in committee").

-45- -45-

Brewster, 408 U.S. at 516 ("In every case thus far before 

this Court, the Speech or Debate Clause has been limited to

an act which was clearly a part of the legislative process." 

(emphasis added)).

It is not enough, as the majority suggests, that

the practice challenged here "affects" the way the

legislature conducts its affairs or "colors the very

conditions under which legislators" do their work. In

Hutchinson v. Proxmire, the Supreme Court, in refusing to 

extend legislative immunity to certain statements made by a

senator in a press release, acknowledged that a senator's

ability to make such statements was arguably "essential to

the functioning of the Senate" and conceded that such

statements affected the legislative environment. 443 U.S. at

130, 131 ("We may assume that a Member's published statements

exert some influence on other votes in the Congress and

therefore have a relationship to the legislative and

deliberative process."). Yet, the Court concluded that no

legislative immunity attached to such statements.19 In

doing so, it observed that it had, in the past, "carefully

distinguished between what is only 'related to the due 

 

19. Similarly, in Bond v. Floyd, 385 U.S. 116 (1966), the 
Supreme Court allowed a suit to go forward challenging on
First Amendment grounds the constitutionality of certain
legislative resolutions preventing the seating of Julian Bond
in the Georgia legislature that had been passed in response
to political statements by Bond that had apparently
displeased his fellow legislators.

-46- -46-

functioning of the legislative process,' and what constitutes 

the legislative process entitled to immunity under the 

[Speech or Debate] Clause." Id. at 131 (emphases added; 

citation omitted). Here, the defendants' challenged

practices, while perhaps "related to the due functioning of

the legislative process," simply do not "constitute[] the

legislative process" in the sense necessary to trigger

absolute legislative immunity. Cf. United States v. McDade, 

28 F.3d 283, 299 (3d Cir. 1994) (declining to extend

legislative immunity for acts which, "although [they

comprised] a necessary precondition for the performance of

[legislative] acts," could not be said to be "an integral

part of Congress's deliberative and communicative

processes"), cert. denied, 115 S. Ct. 1312 (1995). 

That the defendants' challenged practices are not

"legislative" in the sense necessary to trigger immunity and

that the plaintiffs' claim for injunctive relief is not

barred -- most clearly as it names the House doorkeeper -- is

established by a venerable line of Supreme Court authority.

In Kilbourn v. Thompson, 103 U.S. 168 (1881), the Court found 

that members of the U.S. House of Representatives were

entitled to legislative immunity in a lawsuit arising from an

unconstitutional House resolution that had authorized the

arrest of the plaintiff. However, the Court permitted the 

suit to go forward against the House's Sergeant at Arms, who

-47- -47-

had merely executed the unconstitutional arrest warrant. See 

id. at 202. As the Supreme Court later summarized the 

holding of Kilbourn: "That the House could with impunity 

order an unconstitutional arrest afforded no protection for

those who made the arrest." Gravel, 408 U.S. at 618. The 

unconstitutional "resolution was subject to judicial review,"

the Court explained, "insofar as its execution impinged on a

citizen's rights." Id. 

Some ninety years after Kilbourn, in Powell v. 

McCormack, the Court reaffirmed the principle that a suit for 

injunctive relief brought against a legislative employee in

an enforcement-type capacity is not barred by legislative 

immunity. 395 U.S. at 504-05. There, the Court held that

the defendant congressmen were entitled to legislative

immunity for their unconstitutional refusal to seat Adam

Clayton Powell as a Member of the U.S. House of

Representatives. See id. at 506. Applying the teaching of 

Kilbourn, the Court went on to hold that the doctrine of 

legislative immunity did not bar a judicial determination of 

the merits of plaintiffs' constitutional claims, to the

extent that those claims were asserted against the

legislative employees who had merely been responsible for

enforcing the House's resolution, namely, the Sergeant at 

Arms, the Clerk, and the Doorkeeper. See id. at 504-06. The 

Court added that those officials could not assert legislative

-48- -48-

immunity on the ground that they had simply been "acting

pursuant to express orders of the House." Id. at 504.20 

The Court in Powell thus "reasserted judicial power to 

determine the validity of legislative actions impinging on

individual rights" in an action for prospective relief

brought against the legislative functionaries charged with

implementing the allegedly unconstitutional activity.

Gravel, 408 U.S. at 620. 

The Court had applied similar reasoning in

Dombrowski v. Eastland, 387 U.S. 82 (1967) (per curiam), 

decided shortly before Powell. In that case, which arose out 

of an allegedly illegal raid, the Court sustained the defense

of legislative immunity with respect to the Chairman of a

subcommittee of the U.S. Senate Judiciary Committee for

issuing subpoenas to gather information, but declined to

extend immunity to the subcommittee's counsel, who had

allegedly participated in the execution of the illegal raid

to obtain the same information. See id. at 84. Dombrowski 

thus supports the principle that a legislative employee sued

for his role in carrying out or executing an (immunized)

 

20. I respectfully disagree, therefore, with the majority's
suggestion that the legislative immunity doctrine protects
any legislative officials "who do no more than carry out the
will of the body by enforcing [Rule 45] as a part of their
official duties." To the extent that the decision in
Consumers Union of United States, Inc. v. Periodical 
Correspondents' Ass'n, 515 F.2d 1341 (D.C. Cir. 1975), can be 
read for a contrary proposition, I would decline to follow
it.

-49- -49-

legislative directive may be answerable to a private citizen

whose rights have been violated. See Gravel, 408 U.S. at 

619-20.

More recently, in Supreme Court of Virginia v. 

Consumers Union of the United States, Inc., 446 U.S. 719 

(1980), the Supreme Court was presented with an action

brought under 42 U.S.C. 1983 asserting a First Amendment

challenge against certain attorney disciplinary rules that

had been enacted by the Virginia Supreme Court. The

plaintiffs sought declaratory and injunctive relief, naming

the Virginia Court and its Chief Justice (among others) as

defendants. The Supreme Court concluded that the Virginia

Court, in propounding the disciplinary rules, had acted in a

legislative (not judicial) capacity. The Virginia Court was

held entitled to absolute legislative immunity for acts

pertaining to the enactment of the disciplinary rules, e.g., 

refusing to amend the rules to comport with the Constitution.

See id. at 733-34. The Supreme Court further observed, 

however, that the Virginia Court performed not only a

legislative role with respect to the disciplinary rules, but

also had enforcement authority. See id. at 734. The Court 

concluded that to the extent that the plaintiffs' section

1983 action sought prospective relief against the Virginia

Court in its enforcement capacity, the doctrine of 

legislative immunity did not bar the suit. Id. at 736 ("[W]e 

-50- -50-

believe that the Virginia Court and its chief justice

properly were held liable in their enforcement capacities.

. . . For this reason the Virginia Court and its members were

proper defendants in a suit for declaratory and injunctive

relief, just as other enforcement officers and agencies

were.").  

21. Moreover, the defendants' actions in restricting access The Supreme Court's decisions in Kilbourn, 
to the floor and lobbying can be viewed as administrative
(rather than legislative) in nature, and thus not entitled to Dombrowski, Powell, and Supreme Court of Virginia establish 
immunity on that additional ground. Because immunity is
defined by the functions it serves, Forrester v. White, 484  that the doctrine of legislative immunity does not bar a
U.S. 219, 227 (1988), even legislators themselves are not
immune for actions taken in an administrative capacity. In judicial determination of a plaintiff's constitutional claim
Forrester, a state court judge enjoyed no judicial immunity 
for the administrative acts of demoting and dismissing a to the extent that the claim is one for injunctive relief and
probation officer. Even though the acts "may have been quite
important in providing the necessary conditions of a sound is asserted against a defendant simply for his role in
adjudicative system," the decisions underlying the acts were
generic in nature, not intrinsically adjudicative or peculiar enforcing a legislative directive that affects individual 
to the judicial function. See id. at 229. A "judge who 
hires or fires a probation officer [could not] meaningfully rights. See Gravel, 408 U.S. at 618-21. The plaintiffs' 
be distinguished from a district attorney who hires and fires
assistant district attorneys, or indeed from any other action here -- most clearly as it names the House doorkeeper
Executive Branch official who is responsible for making such
employment decisions." Id.; see also Negron-Gaztambide v.  -- comprises precisely such a claim: the doorkeeper is being
Hernandez-Torres, 35 F.3d 25, 28 (1st Cir. 1994) (legislators 
not protected by legislative immunity for administrative act sued solely for his role in enforcing the challenged
of dismissing librarian), cert. denied, 115 S. Ct. 1098 
(1995). exclusion of all but government lobbyists from lobbying on
Under this functional analysis, the defendant
doorkeeper's acts in determining whether particular the House floor, and the claim seeks only to enjoin such
individuals were authorized to enter the House chamber are of
an "administrative" nature within the meaning of Negron-  enforcement. The defendant doorkeeper is not distinguishable
Gaztambide. See id. These acts constitute determinations 
concerning admission and exclusion, no different in nature in any meaningful way from the doorkeeper whose claim of
than those that might be made by an official in the executive
branch entrusted with controlling access to a Governor's absolute legislative immunity was rejected in Powell. See 
press conference or, indeed, a doorkeeper standing outside a
privately-owned building. The doorkeeper's acts do not Powell, 395 U.S. at 504. I would conclude, therefore, that 
entail any peculiarly legislative decisionmaking -- in this
case, those decisions were already embodied in the House's the defendant doorkeeper is not entitled to assert the
adoption of Rule 45. The acts of the doorkeeper in
administering Rule 45 to particular persons seeking access to defense of absolute legislative immunity,21 and I would
the House chamber are thus not legislative, but
administrative and not entitled to absolute immunity.

-51- -51-

accordingly proceed to a determination of the First Amendment

question presented.22

Reaching the merits of plaintiffs' constitutional

claim, importantly, does no injury to the classic interests

protected by the legislative immunity doctrine. The common

law immunity that state legislators enjoy is "similar in

origin and rationale to that accorded Congressmen under the

Speech or Debate Clause." Supreme Court of Virginia, 446 

U.S. at 731. The actions of members of the House in

speaking, debating, or voting on matters before the Rhode

Island House are not being challenged. There is no

infringement on the "fullest liberty of speech" of House

members, nor does this case raise the need to protect House

members "from the resentment of every one, however powerful,

to whom the exercise of that liberty may occasion offense."

Tenney v. Brandhove, 341 U.S. 367, 373 (1951) (citation 

omitted).

The legislative immunity doctrine is not meant for

the protection of the legislators for their own benefit, "but

to support the rights of the people, by enabling their

 

22. As far as the record shows, the defendant Speaker did
not participate in the exclusion of private lobbyists from
the legislative floor. There is no need to decide, at this
time, whether, if the Speaker did participate in other
aspects of Rule 45's enforcement, he would be entitled to
legislative immunity in an action brought against him solely
for his role in such enforcement. Relief against the
doorkeeper's enforcement of the Rule may provide plaintiffs
with all the relief necessary.

-52- -52-

representatives to execute the functions of their office

without fear of prosecutions, civil or criminal." Id. at 

373-74 (citation omitted); see also Brewster, 408 U.S. at 507 

("The immunities of the Speech or Debate Clause were not

written into the Constitution simply for the personal or

private benefit of Members of Congress, but to protect the

integrity of the legislative process by insuring the

independence of individual legislators."). Reaching the

merits of the constitutional question presented here poses no

threat to the independence of the Rhode Island state

legislators.23

Historically, the privileges of the Speech or

Debate Clause emerged from a need to protect the legislature

from executive intimidation and harassment. See Robert J. 

Reinstein & Harvey A. Silverglate, Legislative Privilege and 

the Separation of Powers, 86 Harv. L. Rev. 1113, 1120-44 

(1973). Indeed, the purpose underlying the Speech or Debate

Clause, that is, to enable speech critical of the government,

also underlies the First Amendment's protection of free

speech. Cf. Akhil R. Amar, The Bill of Rights as a 

Constitution, 100 Yale L.J. 1131, 1151 (1991). It would be 

ironic indeed to permit the defendants to invoke those

 

23. Davids v. Akers, 549 F.2d 120 (9th Cir. 1977), does not 
support the proposition that the defendants' practices are
immune from constitutional scrutiny. The court there in fact
reached the merits and scrutinized the plaintiffs' First
Amendment claims, but found them wanting.

-53- -53-

immunities to benefit communications between the executive

branch (government lobbyists) and the legislative branch, to

the exclusion of communication from groups of private

citizens. Judicial illumination of the immunity, as James

Madison said, must be guided by "the reason and the necessity

of the privilege." Letter from James Madison to Philip

Doddridge (June 6, 1832), in 4 Letters and Other Writings of 

James Madison 221 (1884). That reason and necessity dictate 

that this court not credit the immunity defense on the facts

of this case.

First Amendment 

Is the First Amendment violated by the defendants'

practice of admitting government lobbyists onto the House

floor to lobby while excluding those not employed by the

government? The answer, I believe, is that the defendants

have violated the First Amendment. 

Several interrelated and fundamental First

Amendment interests are offended by the defendants'

practices. The defendants have excluded the plaintiffs'

political speech and have done so in a discriminatory manner.

The defendants' practices have resulted in viewpoint- and

content-based discrimination, favoring government speakers

and government viewpoints and excluding non-government

speakers and non-government viewpoints. The restrictions on

speech posed by the practices are severe in their effects.

-54- -54-

Defendants' discriminatory practices also permit the

government unchecked power to act in its self interest,

rather than in the interest of the citizens. These effects

strike at the heart of the First Amendment, and subject

defendants' practices to the highest level of scrutiny, a

scrutiny defendants cannot withstand.24 Those practices

are not narrowly tailored to meet a compelling state

interest, and therefore fail to pass constitutional muster.

The parties have framed the First Amendment issue

in terms of whether the House Chamber floor is a "public

forum." But the "public forum" doctrine, itself

problematic,25 is particularly ill-suited to this case. It

 

24. There are additional reasons to apply heightened
scrutiny. In footnote 4 of United States v. Carolene 
Products Co., 304 U.S. 144, 152 (1938), oft-quoted for other 
language, the Court noted the possibility that:

legislation which restricts those
political processes which can ordinarily
be expected to bring about repeal of
undesirable legislation [might] be
subjected to more exacting judicial
scrutiny under the general prohibitions
of the Fourteenth Amendment than are most
other types of legislation.

The defendants' practices are analogous to just such
restrictive legislation. See John H. Ely, Democracy and 
Distrust 76-77 (1980). 

25. At best, the public forum doctrine is an "analytical
shorthand for the principles that have guided the Court's
decisions." Cornelius v. NAACP Legal Defense and Educational 
Fund, Inc., 473 U.S. 788, 820 (Blackmun, J., dissenting). 
"Beyond confusing the issues, an excessive focus on the
public character of some forums, coupled with inadequate
attention to the precise details of the restrictions on

-55- -55-

is peculiar to attempt to fit the doctrine to the floor of

the chamber of a legislative body at work. Indeed, the very

language of "public forum" masks the issues at stake.

As recognized by the district court, the approach

taken by this Court in AIDS Action Committee of 

Massachusetts, Inc. v. Massachusetts Bay Transportation 

Authority, 42 F.3d 1 (1994), is more apt. This court held 

that where the government was the proprietor of the property

it was inappropriate to analyze under the "relatively murky"

public forum doctrine a discriminatory government practice

affecting First Amendment rights. Id. at 9. At issue in 

AIDS Action Committee was the MBTA's practice of refusing, on 

the grounds that its policy was not to run any sexually

suggestive advertisements, to display condom advertisements

in its subway and trolley cars, while it was at the same time

running sexually suggestive movie advertisements. This court

analyzed and rejected the government's claim that its

practices were viewpoint neutral, finding the government

practice gave rise to an impermissible appearance of

viewpoint discrimination. Because this viewpoint

discrimination disposed of the case, there was no need for

 

expression, can leave speech inadequately protected in some
cases, while unduly hampering state and local authorities in
others." Laurence H. Tribe, American Constitutional Law 992- 
93 (2d ed. 1988) (footnotes omitted); see also Daniel A. 
Farber & John E. Nowak, The Misleading Nature of Public Forum 
Analysis: Content and Context in First Amendment 
Adjudication, 70 Va. L. Rev. 1219 (1984). 

-56- -56-

the court to determine whether the cars were a public forum.

For similar reasons, I do not use conventional "public forum"

terminology.

The discrimination in speech practiced by the

defendant must be understood against those interests that the

First Amendment has repeatedly been recognized as serving.

The First Amendment reflects a distrust of the government

making judgments about what speech is worthwhile,

particularly where political speech is involved.26 A

central commitment of the First Amendment is that "debate on

public issues should be uninhibited, robust, and wide-open."

New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). 

"The maintenance of the opportunity for free political

discussion to the end that government may be responsive to 

the will of the people and that changes may be obtained by 

lawful means, an opportunity essential to the security of the

Republic, is a fundamental principle of our constitutional

system." Stromberg v. California, 283 U.S. 359, 369 (1931) 

 

26. "An insistence that government's burden is greatest for
regulating political speech is based on a sensible view of
government's incentives. It is in this setting that
government is most likely to be biased or to be acting on the
basis of illegitimate, venal, or partial considerations.
Government is rightly distrusted when it is regulating speech
that might harm its own interests; and when the speech at
issue is political, its own interests are almost always at
stake. It follows that the premise of distrust of government
is strongest when politics is at issue. And when the premise
of distrust is strongest, the burden of justification is
highest." Cass R. Sunstein, Democracy and the Problem of 
Free Speech 134 (1993). 

-57- -57-

(emphasis added). "'[T]here is practically universal

agreement that a major purpose of [the First] Amendment [is]

to protect the free discussion of governmental affairs' . . .

. 'For speech concerning public affairs is more than self-

expression; it is the essence of self-government.'" Burson 

v. Freeman, 504 U.S. 191, 196 (1992) (quoting Mills v. 

Alabama, 384 U.S. 214, 218 (1966) and Garrison v. Louisiana, 

379 U.S. 64, 74-75 (1964)). Political expression is at the

center of the rights protected by the First Amendment. See 

id.; Robert H. Bork, Neutral Principles and Some First 

Amendment Problems, 47 Ind. L.J. 1, 29 (1971); Cass R. 

Sunstein, Free Speech Now, 59 U. Chi. L. Rev. 255, 301 

(1992). 

The defendants' practices in excluding the voice of

private, but not government, lobbyists from the House floor

imposes a severe burden on political speech. Lobbying aims

at influencing the votes of legislators; it attempts to

affect the outcome of the political processes. Such speech

is "at the heart of the First Amendment's protection." First 

National Bank of Boston v. Bellotti, 435 U.S. 765, 776 

(1978). More specifically, lobbying involves the attempt by

groups of citizens to have their hired representatives

persuade legislators to legislate in ways that are favorable

-58- -58-

to the interests of those citizens.27 "In a representative

democracy such as this, these branches of government act on

behalf of the people and, to a very large extent, the whole

concept of representation depends upon the ability of the

people to make their wishes known to their representatives."

Eastern Railroad Presidents Conf. v. Noerr Motor Freight, 

Inc., 365 U.S. 127, 137 (1961); see also Meyer v. Grant, 486 

U.S. 414, 421 (1988) ("[B]oth the expression of a desire for

political change and a discussion of the merits of the

proposed change" are "core political speech."). Where a

challenged practice, as here, imposes a severe burden on

political expression, courts must review the practice with

 

27. Lobbying may be protected not only as speech, but also
as an exercise of the right to petition. That right,
explicitly embodied in the First Amendment, encompasses the
right of citizens to communicate with their legislative
representatives. See Eastern Railroad Presidents Conf. v. 
Noerr Motor Freight, Inc., 365 U.S. 127, 137 (1961) (stating 
that the right of petition protects "the ability of the
people to make their wishes known to their representatives").
As lobbying constitutes an important means by which citizens
can collectively make their wishes known to the legislature,
lobbying itself may fall under the coverage of the Petition
Clause. See id. at 137-38; United States v. Nofziger, 878 
F.2d 442, 453 (D.C. Cir.) (reading Supreme Court precedents
for the proposition that lobbying, "insofar as it constitutes
self-representation," is protected by the First Amendment
right to petition), cert. denied, 493 U.S. 1003 (1989); see 
generally Amar, Bill of Rights, supra, at 1155-56 (suggesting 
that part of the purpose of the Petition Clause was to
guarantee that citizens would have a means of informing
representatives of their needs and concerns).

-59- -59-

strict scrutiny. Cf. Burdick v. Takushi, 504 U.S. 428, 434 

(1992).28

The private lobbyist restriction is subject to

strict scrutiny not only because it severely burdens

political speech, but also because it discriminates both on

the basis of viewpoint and content. See Burson, 504 U.S. at 

197. The restriction constitutes content-based

discrimination because it targets a particular kind of

speech. It is also viewpoint-based discrimination because it

excludes a particular set of messages. The result is a

speaker-based ban and a content-based bar that gives

advantage to the government's viewpoint.29 The

discrimination practiced by defendants thus permits

expression of the "particular message favored by the

government" and stifles all other speech. See Turner 

Broadcasting System, Inc. v. FCC, 114 S. Ct. 2445, 2458 

(1994); id. at 2477 (O'Connor, J., concurring in part and 

 

28. Lobbying is not subject to a lower standard of
protection even if the hired representatives do it for a
profit. See Board of Trustees of the State Univ. of N.Y. v. 
Fox, 492 U.S. 469, 482 (1989). 

29. That the non-governmental viewpoint may in fact be an
entire class of varying viewpoints does not make the
restriction any the less viewpoint discrimination. See 
Rosenberger v. Rector and Visitors of the Univ. of Va., 115 
S. Ct. 2510, 2518 (1995) (rejecting argument that "no
viewpoint discrimination occurs because the [challenged
rules] discriminate against an entire class of viewpoints",
and saying that the "declaration that debate is not skewed so
long as multiple voices are silenced is simply wrong").

-60- -60-

dissenting in part) ("The First Amendment does more than just

bar government from intentionally suppressing speech of which

it disapproves. It also generally prohibits the government

from excepting certain kinds of speech from regulation

because it thinks the speech is especially valuable.").

The defendants' practices thus cannot be

constitutional unless they are narrowly tailored to achieve a

compelling state interest. Id. at 2467 ("[S]peaker-based laws 

demand strict scrutiny when they reflect the Government's

preference for the substance of what the favored speakers

have to say (or aversion to what the disfavored speakers have

to say)."); First Nat'l Bank of Boston, 435 U.S. at 785 

(First Amendment forbids government from "dictating the

subjects about which persons may speak and the speakers who

may address a public issue."). The government lobbyist

preference as applied here fails that test.

The dangers of the defendants' practices are

plain.30 By simply excluding all voices save the voices of

government lobbyists, the government could easily

 

30. In the franchise cases, corollary concerns about the
representative nature of government led the Supreme Court to
invalidate laws which resulted in groups of persons being
frozen out of the decision process. Reynolds v. Sims, 377 
U.S. 533 (1964); Harper v. Virginia Bd. of Elections, 383 
U.S. 663 (1966); Carrington v. Rash, 380 U.S. 89 (1965) 
(invalidating Texas statute denying franchise to those in
military who moved into the state where Texas attempted to
justify the statute by arguing military personnel might
otherwise start influencing elections).

-61- -61-

suppress support for a minority party or
an unpopular cause, or . . . exclude the
expression of certain points of view from
the marketplace of ideas.

Members of the City Council v. Taxpayers for Vincent, 466 

U.S. 789, 804 (1984). These effects are "so plainly

illegitimate that they would immediately invalidate the

rule." Id. "[Rhode Island] has no . . . authority to 

license one side of [the] debate to fight freestyle, while

requiring the other to follow Marquis of Queensbury Rules."

R.A.V. v. City of St. Paul, Minn., 112 S. Ct. 2538, 2548 

(1992). 

Nor is this risk hypothetical. The Rhode Island

House is singular in the lack of opportunity for private

citizens to have direct, effective communications with

legislators. The ability to communicate directly is a

considerable advantage. The situation created by the private

lobbyist ban is that akin to a monopoly over a single channel

of communication, where the government has discriminated in

providing access to that channel and also determined the

content of what flows through the channel. 

Against this panoply of dangers31 must be

 

31. Defendants' argument poses yet other dangers too. If
the legislature gets information from nowhere but the
executive branch, the legislature's ability to act
independently, and thus to be a check and balance to the
executive is undercut. This corollary danger of the
undercutting of the separation of powers at the state level
is keenly illustrated by the amicus brief filed by the
executive branch, urging strongly its interest in

-62- -62-

measured the interests attributed to the defendants. The

majority finds, in the immunity analysis, that there are two

such interests32 and that the interests would pass a rational

basis test, at least for determining whether to carve out an

exception to the immunity it would grant. Without accepting

the premise that the only exceptions to immunity are

irrational legislative acts, neither of those interests is

sufficient to withstand strict scrutiny.33 Indeed, the

 

communicating with the legislature and supporting the
exclusion of private voices.

32. To the extent that the House Rule on its face was
justified as an effort to maintain decorum and control noise
to a level which did not interfere with the members work, the
record shows instances in which government lobbyists on the 
floor were objected to by members as causing problems. The
defendants accordingly do not try to justify their
discriminatory distinction on such grounds.

33. Defendants' practice does not even meet the less
rigorous test of intermediate scrutiny. Intermediate
scrutiny of restrictions has traditionally been applied to
commercial speech that concerns unlawful activity or is
misleading, see Florida Bar v. Went For It, Inc., 115 S. Ct. 
2371, 2375 (1995), and to content-neutral restrictions that
impose an incidental burden on speech, see Turner 
Broadcasting, 114 S. Ct. at 2469. The test has three related 
prongs: first, the government must assert a substantial
interest in support of the regulation; second, the government
must demonstrate that the restriction directly and materially
advances that interest; and third, the regulation must be
"narrowly drawn." Florida Bar, 115 S. Ct. at 2376. The 
government's asserted interest in having government lobbyists
on the floor of the House, to the exclusion of private
lobbyists, is to have them provide information. But the
government has not shown why the interest in having only
government provide information, and not private groups, is
"substantial." Relatedly, the restriction is not "narrowly
tailored" to meet the information provision goal because it
is overbroad and serves to exclude valuable information that
private lobbyists might provide. 

-63- -63-

defendants' bedrock argument is different again, and it, too,

is insufficient.

The majority credits reasons of bolstering

legislative independence and of having government lobbyists

act to provide information. But legislative independence was

proffered as a reason for Rule 45 on its face, which excludes

all lobbyists, and not to the distinction between government

and non-government lobbyists.34

Defendants argue that allowing only governmental

lobbyists access to the floor of the legislature serves the

goal of allowing legislators to receive valuable information.

Defendants, however, have established no demonstrable

interest in receiving information from the government to the

exclusion of private sources. The state's purported interest

in limiting the information available to legislators to those

 

34. A goal of legislative independence is quite legitimate.
But the interest distinctively served by the private lobbyist
restriction is to display to the public the legislature's
special hostility towards the private interest groups that
attempt to influence their votes. "The politicians of [Rhode
Island] are entitled to express that hostility -- but not
through the means of imposing unique limitations upon
speakers who (however benightedly) disagree." R.A.V., 112 S. 
Ct. at 2550. "The point of the First Amendment is that
majority preferences must be expressed in some fashion other
than silencing speech on the basis of its content." Id. at 
2548. "[T]he First Amendment as we understand it today rests
on the premise that it is government power, rather than
private power, that is the main threat to free expression;
and as a consequence, the Amendment imposes substantial
limitations on the Government even when it is trying to serve
concededly praiseworthy goals." Turner Broadcasting, 114 S. 
Ct. at 2480 (O'Connor, J., concurring in part and dissenting
in part).

-64- -64-

sources controlled by its own interests is hardly a

compelling one.35 "A State's claim that it is enhancing

the ability of its citizenry to make wise decisions by

restricting the flow of information to them must be viewed

with some skepticism. . . . '[I]t is often true that the best

means to that end is to open the channels of communication

rather than to close them.'" Anderson v. Celebrezze, 460 U.S. 

780, 798 (1983) (quoting Virginia Pharmacy Board v. Virginia 

Consumer Council, 425 U.S. 748, 770 (1976)). 

Further, the private lobbyist restriction is not

narrowly tailored to serve the legislature's asserted

interest in receiving information. Simon & Schuster, Inc. v. 

Members of the New York State Crime Victims Bd., 112 S. Ct. 

 

35. Defendants attempt to liken their private lobbying
restriction to the restrictions on lobbying imposed by Rule
XXXII of the United States House of Representatives.
Defendants' analogy, however, works against them and
demonstrates that there is no "compelling" need to give
government lobbyists access to the floor to lobby while
excluding others. Unlike the defendants' practices, the U.S.
House of Representatives Rule does not allow government
lobbyists to lobby while excluding private lobbyists. Rule
XXXII is neutral and excludes all lobbyists. Even those
normally afforded the courtesy of admission to the floor --
former Members of the House, former Parliamentarians, former
elected officers, and former elected minority employees of
the House -- are denied admission if they or their
organizations have any interest in matters before the House.
Similarly, staff of a Member are not allowed to lobby on the
occasions they are admitted to the House. That the United
States House of Representatives has chosen neutrality and not
to grant preference to the government lobbyists and
information providers (if there is any distinction) undercuts
any argument by defendants that they have a compelling need
to give preference to the government.

-65- -65-

501, 511 n.** (1991). In this case the restriction excludes

valuable information from the legislative purview. As the

majority points out, lobbying groups have vastly different

interests and perspectives. Access to such varied and

independent sources of information, far from impeding the

legislature's access to useful information, surely functions

to increase both the quality and the quantity of the total

set of information available. 

The provision of information from executive branch

agencies to members of the legislature is a very legitimate

interest of government. The majority suggests there is a

distinction between mere information providing and lobbying,

but that distinction is contradicted by the record. The

factual findings of the district court leave no doubt that

the court considered the contention that government lobbyists

were engaging in mere "information-providing" and rejected it

as a factual matter. 

Even if the distinction were tenable on the facts

here, as it is not, it does not provide refuge from the First

Amendment. There is plainly value to the speech by

government lobbyists, whether it be heavy-handed lobbying or

more lightly dexterous provision of information. See Block 

v. Meese, 793 F.2d 1303, 1312-14 (D.C. Cir.) (Scalia, J.), 

cert. denied, 478 U.S. 1021 (1986). But the value of 

government speech is not the point. Rather, the point is

-66- -66-

that the government has permitted itself to speak while

prohibiting non-government speech. 

Speech from non-government speakers, including

lobbyists, is also valuable. Indeed, while lobbying may be

subject to registration and disclosure,36 no case has ever

suggested that lobbying, including its information-gathering

and providing component, could be banned entirely. But that

issue need not be reached here, for what is clear is that the

government must keep the playing field level.37

Moreover, even if there were greater reason to

credit the distinction between "information providing" and

"lobbying," First Amendment "due process" type issues would

still preclude reliance on the distinction to justify the

restriction of First Amendment rights. See Henry P. 

Monaghan, First Amendment "Due Process", 83 Harv. L. Rev. 

 

36. This case does not involve any issue of government
subsidy, creation of a government program, or of the taxable
status of organizations involved in lobbying. Cf. Regan v. 
Taxation With Representation, 461 U.S. 540 (1983). 

37. It is recognized in the political science literature
that much of what modern day lobbyists do involves the
gathering and provision of information to legislators. Cf. 
Edward O. Laumann et al., Washington Lawyers and Others: The 
Structure of Washington Representation, 37 Stan. L. Rev. 465, 
495 (1985); James Q. Wilson, Political Organizations xix-xx 
(1995); Jeffrey S. Banks & Barry R. Weingast, The Political 
Control of Bureaucracies under Asymmetric Information, 36 Am. 
J. Pol. Sci. 509 (1992). Political scientists have found
that lobbyists' primary strategy in influencing legislators
is to provide information to counteract the similar efforts
of other groups, not to achieve influence through pressure
tactics. See David Austen-Smith & John R. Wright, 
Counteractive Lobbying, 38 Am. J. Pol. Sci. 25 (1994). 

-67- -67-

518, 519 (1970) ("If the Constitution requires elaborate

procedural safeguards in the obscenity area, a fortiori it

should require equivalent procedural protection when the

speech involved - for example, political speech - implicates

more central first amendment concerns."). Even if there were

a discernible distinction, the "difference between factual

statement and advocacy may turn upon the debatability of the

facts described as true, or the pertinency of facts omitted."

Block, 793 F.2d at 1313. The distinction between providing 

information and acting for the purpose of "influencing in any

manner the passage of legislation" is exceedingly fine.

Here, legislators testified that "information" provided did

in fact influence them on how to vote. The House has

recognized that information may influence votes. Rule 45 on

its face provides that "no person . . . shall either directly 

or indirectly" engage in the practice of lobbying. The House 

has thus drawn the line to preclude any activity, even

indirect, to influence votes. The First Amendment puts the

burden on the government to finely tailor its practices to

permissible goals, and no such fine tailoring was done by

defendants' practices here. See Rubin v. Coors Brewing Co., 

115 S. Ct. 1585, 1593 (1995).

The real argument that the defendants have

articulated to justify their actions is their claim that

government lobbyists represent the people while non-

-68- -68-

government lobbyists do not. Accordingly, they say, there is

no cause to worry. That is an inversion of constitutional

values. While there may be value to the government voice, it

cannot be the only voice. To permit that to be so would be

to stifle discussion. See Buckley v. Valeo, 424 U.S. 1, 14 

(1976) ("Discussion of public issues . . .[is] integral to

the operation of the system of government established by our

Constitution. The First Amendment affords the broadest

protection to such political expression in order 'to assure

[the] unfettered interchange of ideas for the bringing about

of political and social changes desired by the people.'"

(citing Roth v. United States, 354 U.S. 476 (1957))). 

There is another danger, and that is that the

government's voice will not truly represent the interests of

the public.38 Government should theoretically represent

 

38. Defendants express a legitimate concern that government
may be captured by "special interests." Apart from the fact
that the government itself is frequently its own special
interest group, the solution to the problem of a government
captured by "special interests" would hardly be to have the
government speak only to itself.
Moreover, many of the plaintiff groups may hardly
be characterized as the centers of wealth, power and
privilege. Citizens, who themselves may not be affluent or
powerful, band together in groups to lobby the government,
whether the groups be, to give but two examples, the Rhode
Island State Right To Life Committee, Inc., or the local
chapter of the ACLU. These groups may be thought to be a way
to avoid the capturing of government by "special interests."
Defendants' practices may thus thrust them headlong into the
dangers they profess to wish to avoid. Central to effecting
a system of democratic self-governance is enabling private
interests to be able to act in concert. Without collective
action it may be impossible to alter the status quo. See 

-69- -69-

the people and not represent itself. Theory and reality

often depart. The government is not always a mirror of the

people. Government employees today are recognized as

constituting their own interest group. See E. Nordlinger, On 

the Autonomy of the Democratic State (1981). 

The Framers had a fear that, once in power,

legislators had an obvious incentive to use "that power to

perpetuate themselves or their ilk in office." U.S. Term 

Limits, Inc. v. Thornton, 115 S. Ct. 1842, 1911-12 (1995) 

(Thomas, J., dissenting) (pointing out numerous instances of

modern day legislation and rulemaking that produce the effect

of perpetuating incumbents in office). T h e F r a m e r s

recognized this would happen and intended the First Amendment

to act as a check. James Madison identified the problem of

government acting in its self-interest, in contrast to the

interests of those it purported to represent, as one of the

two fundamental problems of the republican form of

government.39 "It is of great importance in a republic not

 

Sunstein, Democracy and the Problem of Free Speech, supra, at 
245-46.

39. In a seminal immunity case, Justice Black recognized

Unfortunately, it is true that
legislative assemblies, born to defend
the liberty of the people, have at times
violated their sacred trusts and become
the instruments of oppression. . . .
Those who cherish freedom [under the
First Amendment] here would do well to
remember that this freedom cannot long

-70- -70-

only to guard the society against the oppression of the 

rulers, but to guard one part of society against the 

injustice of the other part." The Federalist No. 51, at 161 

(James Madison) (Roy P. Fairfield 2d ed. 1981) (emphasis

added). Madison feared that government might choose to serve

itself instead of the citizens, saying:

In framing a government which is to be
administered by men over men, the great
difficulty lies in this: you must first
enable the government to control the
governed; and in the next place oblige it
to control itself. A dependence on the
people is, no doubt, the primary control
on government; but experience has taught
mankind the necessity of auxiliary
precautions.

Id. at 160; see also Amar, The Bill of Rights, supra, at 

1132-33. Central among those "auxiliary precautions" in

obliging the government to control itself from self-interest

and self-dealing are the protections afforded to citizens by

 

survive the legislative snuffing out of
freedom . . . to speak.

Tenney v. Brandhove, 341 U.S. 367, 380-81 (1951) (Black, J., 
concurring).
Justice Black echoed concerns voiced earlier by one
of the Framers of the Constitution and advocates for adoption
of the Bill of Rights: "No legislative act, therefore,
Contrary to the Constitution, can be valid. To deny this
would be to affirm . . . that the representatives of the
people are superior to the people themselves." The 
Federalist No. 78, at 228 (Alexander Hamilton) (Roy P. 
Fairfield 2d ed. 1981) (reply to "Brutus").

-71- -71-

the First Amendment. Defendants' actions violate this

essential purpose of the First Amendment.

Accordingly, I would affirm the declaration by the

district court that the practices of the defendants are

unconstitutional.40 In my view, the defendants must either

adhere to the House Rule and exclude all from its floor who

speak to influence its vote or the House must equally open

its floor, and not prefer the government's voice. That

choice belongs to the House. Under the Constitution, the

choice of preferring the government voice and excluding the

non-government voices does not.

 

40. The injunction entered by the District Court against the
House, which was not a party to the suit, was in error.

-72- -72-